**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| AMERICAN FEDERATION OF TEACHERS, AFL-CIO; UNITED FEDERATION OF TEACHERS; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; SEIU HEALTHCARE MINNESOTA & IOWA; SEIU COMMITTEE OF INTERNS AND RESIDENTS; UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO; UFCW LOCAL 135; INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO; AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; UNITED NURSES ASSOCIATIONS OF CALIFORNIA/UNION OF HEALTH CARE PROFESSIONALS; and AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, | Case No. 1:25-cv-03072-AS<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>**ORAL ARGUMENT REQUESTED** |
| PLAINTIFFS, | |
| v. | |
| GREGORY GOLDSTEIN, in his official capacity as Acting Director of the Federal Mediation and Conciliation Service; FEDERAL MEDIATION AND CONCILIATION SERVICE; UNITED STATES OF AMERICA; UNITED STATES OFFICE OF MANAGEMENT AND BUDGET; and RUSSELL T. VOUGHT, in his official capacity as the Director of the Office of Management and Budget, | |
| DEFENDANTS. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

    A.   FMCS's Statutory Functions.................................................................................... 2

    B.   FMCS's Recent Staffing and Funding .................................................................... 2

    C.   President Trump's Executive Order 14238 and the Dismantling of FMCS ...................... 3

ARGUMENT ................................................................................................................................. 7

    I.   Plaintiffs Are Likely to Succeed on the Merits.......................................................... 7

        A.   Plaintiffs Have Article III Standing.................................................................... 8

            1.   Plaintiffs' Institutional Injury. ....................................................... 8

            2.   Plaintiffs' Associational Injury on Behalf of Their Members. ........................... 10

            3.   Causation and Redressability........................................................... 11

        B.   Defendants' Actions Dismantling FMCS Violate the APA (Counts I and II). ......... 11

            1.   Dismantling FMCS Is a Final Agency Action................................................. 11

            2.   Dismantling FMCS Violates Section 706(2) of the APA.................................. 12

                a.   Defendants' Actions Are Contrary to Law. ................................. 13

                b.   Defendants' Actions Are In Excess of Statutory Authority and Contrary to Constitutional Principles........................................... 15

                c.   Defendants' Actions Are Arbitrary and Capricious................................. 17

            3.   Defendants Have Unlawfully Withheld Agency Action from Plaintiffs, in Violation of Section 706(1) of the APA. ..................................... 22

        C.   Defendants' Actions Dismantling FMCS Violate the Separation of Powers (Count III)........................................................................... 23

    II.   Absent Preliminary Relief, Plaintiffs Are Likely to Suffer Irreparable Harm.................. 24

    III.   The Balance of Equities and the Public Interest Favor Preliminary Relief ...................... 27

CONCLUSION............................................................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) .............................................................................16

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...........................................................................................11

*Biden v. Texas*,
    597 U.S. 785 (2022) ...........................................................................................12

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) ...........................................................................................21

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) .......................................................................14, 16

*Clinton v. City of New York*,
    524 U.S. 417 (1998) .........................................................................................9, 17

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    603 U.S. 799 (2024) ...........................................................................................11

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) .......................................................................................17, 22

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ...........................................................................................17, 21

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .....................................................................................1, 8, 20

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
    145 S. Ct. 898 (2025) .........................................................................................21

*Frankl v. HTH Corp.*,
    650 F.3d 1334 (9th Cir. 2011) .............................................................................25

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ...........................................................................................24

*Hartford Courant Co., LLC v. Carroll*,
    986 F.3d 211 (2d Cir. 2021) ................................................................................27

*Int'l Union of Elec., Radio & Mach. Workers v. NLRB,*
    426 F.2d 1243 (D.C. Cir. 1970) ................................................................................................25

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock,*
    477 U.S. 274 (1986) ....................................................................................................................11

*Irish Lesbian & Gay Org. v. Giuliani,*
    143 F.3d 638 (2d Cir. 1998) ......................................................................................................10

*Kendall v. U.S. ex rel. Stokes,*
    37 U.S. (12 Pet.) 524 (1838) ......................................................................................................15

*Maine Cmty. Health Options v. United States,*
    590 U.S. 296 (2020) ....................................................................................................................14

*Michigan* v. *EPA,*
    576 U.S. 743 (2015) ..............................................................................................................17, 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ......................................................................................................................21

*Myers v. United States,*
    272 U.S. 52 (1926) ......................................................................................................................17

*NAACP, Inc. v. Town of E. Haven,*
    70 F.3d 219 (2d Cir. 1995) ........................................................................................................24

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
    595 U.S. 109 (2022) ....................................................................................................................17

*Nat'l Treasury Emps. Union v. Chertoff,*
    452 F.3d 839 (D.C. Cir. 2006) ................................................................................................8, 9

*Nat'l Treasury Emps. Union v. Vought,*
    No. CV 25-0381 (ABJ), 2025 WL 942772 (D.D.C. Mar. 28, 2025) ......................................24

*Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville,*
    508 U.S. 656 (1993) ......................................................................................................................9

*New York v. U.S. Dep't of Educ.,*
    477 F. Supp. 3d 279 (S.D.N.Y. 2020) ........................................................................................7

*NLRB v. Electro-Voice, Inc.,*
    83 F.3d 1559 (7th Cir. 1996) ....................................................................................................25

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ................................................................................................................22, 23

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ...................................................................................................... 17

*Seeler v. Trading Port, Inc.*,
   517 F.2d 33 (2d Cir. 1975) .......................................................................................... 25

*Small v. Avanti Health Sys., LLC*,
   661 F.3d 1180 (9th Cir. 2011) ..................................................................... 10, 11, 24, 25

*State v. Trump*,
   No. 25-CV-01144 (JAV), 2025 WL 573771 (S.D.N.Y. Feb. 21, 2025) ........................ 15

*In re United Mine Workers of Am. Int'l Union*,
   190 F.3d 545 (D.C. Cir. 1999) ..................................................................................... 15

*Velesaca v. Decker*,
   458 F. Supp. 3d 224 (S.D.N.Y. 2020) .......................................................................... 27

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ..................................................................................................... 15

*Widakuswara v. Lake*,
   No. 25-CV-2390 (JPO), 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) ................... *passim*

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................................................... 7, 27

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ..................................................................................................... 24

**Statutes & Regulations**

5 U.S.C. § 701 ........................................................................................................................ 1

5 U.S.C. § 704 ........................................................................................................................ 7

5 U.S.C. § 706 ............................................................................................................... *passim*

5 U.S.C. § 7119 .................................................................................................................... 14

29 U.S.C. § 158 ............................................................................................................ *passim*

29 U.S.C. § 172 ................................................................................................................ 2, 15

29 U.S.C. § 173 ............................................................................................................ *passim*

29 U.S.C. § 175 .................................................................................................................... 13

Civil Service Reform Act of 1978, Pub. L. No. 95-454 ....................................................... 13

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4....................3

Health Care Amendments of 1974, Pub. L. No. 93-360.................................................................13

Labor Management Cooperation Act of 1978, Pub. L. No. 95-524 .............................................13

Taft-Hartley Labor Management Relations Act of 1947, Pub. L. No. 80-101 ........................2, 13

29 C.F.R. § 1403.4.......................................................................................................................23

**Other Authorities**

U.S. Const. art. II, § 3 ............................................................................................................15, 16

## INTRODUCTION

More than 75 years ago, Congress created the Federal Mediation and Conciliation Service ("FMCS") and required it to offer mediation services to unions and employers whenever in the judgment of FMCS a labor "dispute threatens to cause a substantial interruption of commerce." 29 U.S.C. § 173(b). In 1974, Congress expanded that mandate by requiring FMCS to offer mediation services for *all* labor disputes in the healthcare industry. 29 U.S.C. § 158(d)(C). Since then, Congress has added additional duties to FMCS. *Infra* pp. 13–14.

FMCS has provided its services with remarkable success. In recent years, it has done so with a staff of 143 mediators and annual Congressional funding of approximately $54 million, 0.0014% of the federal budget.

But on March 14, 2025, President Trump signed an Executive Order directing that FMCS's services be eliminated or otherwise reduced to their statutory minimum, without giving any reason. In a matter of days, FMCS has terminated almost all of its services and reduced its staff of 143 mediators to *five*. Now, only five mediators remain at FMCS to provide all of the services that Congress has mandated and consistently funded.

The dismantling of FMCS is unlawful and unconstitutional. It violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.* many times over. And it usurps Congress's Article I powers by accreting more and more Article II power for the Executive Branch. But under Article III, this Court is empowered to intervene and must act swiftly. Plaintiffs are labor unions in New York and across the country that abruptly lost the services of FMCS mediators because of the President's Executive Order and Defendants' actions to implement it. They urgently request that this Court grant their motion for preliminary injunction and order Defendants immediately to cease dismantling FMCS and to restore the status quo ante.

## BACKGROUND

### A.    FMCS's Statutory Functions

In the Labor Management Relations Act of 1947 ("Taft-Hartley"), Congress established FMCS as an independent agency, and gave it a job to do: "It shall be the duty of [FMCS], in order to prevent or minimize interruptions of the free flow of commerce growing out of labor disputes, to assist parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." Pub. L. No. 80-101, § 202; 29 U.S.C. §§ 172(a), 173(a).

Since then, Congress has repeatedly expanded FMCS's mission. Various statutes, described in more detail below, *see infra* pp. 13–14, charge FMCS with mandatory mediation of disputes in the healthcare industry; establishing and operating joint labor-management committees; appointing arbitration panels and arbitrators to resolve disputes arising under collective bargaining agreements ("CBAs"); conducting skills development and conflict resolution training for employers and employees; and providing services to assist with negotiation impasses in the federal sector and certain labor disputes in the U.S. Postal Service.

### B.    FMCS's Recent Staffing and Funding

FMCS is a small agency, with a staff in 2024 of 143 mediators and 61 other full-time employees. Compl. ¶ 4. Even with that lean staff, FMCS has been remarkably successful. *See id.* ¶¶ 85–86. In 2024 alone, FMCS mediated 2,318 collective-bargaining negotiation sessions, 1,362 high-impact grievances, and 792 alternative-dispute resolution cases; conducted 1,477 training and intervention panels; and provided 10,004 arbitration panels and appointed 4,350 arbitrators. *Id.* ¶ 3. By its own conservative estimates, FMCS's efforts have saved the American economy "over $500 million annually." *Id.* ¶ 84.

FMCS also operates on a small budget. For the last several years, Congress has consistently appropriated approximately $54 million for FMCS, representing 0.0014% of the federal budget.[1] Congress appropriated that same amount for 2025 in the most recent appropriations law, enacted on March 15, 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101(a)(8), 139 Stat. 9, 10–11 (2025). That appropriation followed FMCS's detailed budget request to support its services at historical levels, "[g]iven the anticipated size and number of collective bargaining agreements expiring in 2025, the need to update [FMCS's] technical capacity to meet the anticipated demand for FMCS services, and the ongoing need for labor and management to work collaboratively to achieve competitiveness, economic development, and job security." FMCS, *Congressional Budget Submission 2025*, at 13 (March 2024), https://www.fmcs.gov/wp-content/uploads/2024/03/2025-Congressional-Budget.pdf.

### C.    President Trump's Executive Order 14238 and the Dismantling of FMCS

On March 14, 2025, one day before signing the continuing appropriations passed by Congress, President Trump issued Executive Order No. 14238, entitled "Continuing the Reduction of the Federal Bureaucracy." The Executive Order directed that "the non-statutory components and functions [of FMCS and six other independent agencies] . . . shall be eliminated to the maximum extent consistent with applicable law," and that "such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." Exec. Order No. 14238 § 2(a)(i). The Executive Order directed FMCS to comply within one week by "explaining which components or functions . . . , if any, are

---

[1] *Targeting Elimination of Federal Mediation and Conciliation Service*, Economic Policy Institute (Mar. 24, 2025), https://www.epi.org/policywatch/targeting-elimination-of-federal-mediation-and-conciliation-service/.

statutorily required and to what extent." *Id.* § 2(b). The Executive Order further directed Office

of Management and Budget ("OMB") Director Russell Vought to "reject funding requests for

[FMCS] to the extent they are inconsistent with this order." *Id.* § 2(c). FMCS timely responded

with a review of its statutory mandates and concluded that it would need to retain 100 mediators

(or 80 mediators if services were provided primarily via remote meetings) to fulfill those

mandates. Compl. ¶ 97.

A few days later, individuals associated with DOGE and OMB rejected FMCS's plan.

DOGE and OMB directed FMCS to reduce the number of mediators from 143 to *five*. *Id.* ¶¶ 99–

100. DOGE and OMB further directed cuts to the nonmediator FMCS staff, leaving only the

Acting Director, four employees in the Office of General Counsel, and a skeleton staff of four to

five employees for budget, procurement, security, mail, reviewing statutory notices from

bargaining parties, and providing arbitration panels. DOGE and OMB also directed FMCS to

close all nine of its field offices, leaving only the Washington, D.C. headquarters open. *Id.* ¶¶

101–02.

Following that direction, FMCS placed nearly all of its mediators and staff on

administrative leave, effective March 26. On March 31, affected employees began receiving

specific notices of a Reduction in Force (RIF) taking effect May 10 pursuant to an OPM waiver

of the 60-day notice period normally required for a RIF. *See* Ex. 1 (RIF Notice); Ex. 2 (OPM

Waiver). On information and belief, the RIF notices and the OPM waiver contain the entirety of

FMCS's reasoning for essentially shuttering its services:

> This RIF is necessary to implement President Donald Trump's Executive Order
> (s) 14210, dated February 11, 2025, and Executive Order 14238 of March 14,
> 2025. FMCS is impacted by lack of work due to significant curtailment of duties.
> The administration's interpretation of substantial impact to interstate commerce
> under Taft Hartley is when the dispute involves a bargaining unit of 1000

4

employees or other metrics or instances as the administration may determine and
communicate to FMCS.

Ex. 1; *see also* Ex. 2.

On April 7, one mediator who remains at FMCS confirmed this interpretation and

described a further limit to the agency's services in healthcare disputes in an email to an affected

union: "Under DOGE," the agency would only provide mediation services to (1) private sector

bargaining units of 1,000 or more employees, and (2) healthcare bargaining units of 250 or more

employees—"[a]ll other cases will be closed." Thornton Decl. ¶ 11 & Ex. A. As a result of the

mass RIF, "[n]early all of the services [FMCS has] provided—mediation for collective

bargaining, grievances, employment disputes, EEOC complaints, and trainings with both unions

and management to promote labor peace—are no longer going to be provided."[2]

Thus, FMCS currently has only five mediators to provide the statutorily required services

of mediating labor disputes—3.4% of the mediator workforce it had just a few weeks ago. As

detailed in the declarations of two longtime FMCS employees, five mediators cannot

conceivably perform all the services that Congress has mandated. Ramirez Decl. ¶ 27; Kelleher

Decl. ¶ 9.

Six of the Plaintiffs were actively using the services of FMCS mediators in collective

bargaining negotiations until March 26, when the mediators abruptly canceled their services

because Defendants had placed them on administrative leave. Trager Decl. ¶¶ 10, 18; Walters

Decl. ¶ 15; Gulley Decl. ¶¶ 7, 10, 14; Dashefsky Decl. ¶¶ 7–8; Hemming Decl. ¶ 8; Thornton

Decl. ¶¶ 10, 12. Another Plaintiff had three FMCS mediators scheduled to attend negotiations

beginning May 5, 2025, who presumably will no longer all be there. Guzynski Decl. ¶¶ 4, 7.

---

[2] *Federal Labor Mediation Agency Cuts Staff Down to 'Skeleton Crew*,*'* Fed. News Network
(Mar. 26, 2025), https://federalnewsnetwork.com/workforce/2025/03/federal-labor-mediation-
agency-cuts-staff-down-to-skeleton-crew/.

These labor disputes affect a cumulative total of tens of thousands of employees in healthcare bargaining units alone, plus tens of thousands more in other industries. *See, e.g.*, Guzynski Decl. ¶¶ 2–4; Dashefsky Decl. ¶ 3; Walters Decl. ¶ 6. Plaintiffs are left with expired CBAs, stalled negotiations with no resolution in sight, and the now daily threat that employees will strike or employers will lock them out from their workplaces to force them to accept unfavorable terms. Without the assistance of FMCS mediators, Plaintiffs and the public are imminently threatened with irreparable harm.

The value of FMCS mediators in negotiating collective bargaining settlements cannot be overstated. FMCS mediators specialize in the resolution of labor disputes. They are experienced and highly skilled in helping employers and unions find mutually acceptable solutions to contentious issues that arise in their workplaces—not just wages, but pensions, benefits, and work rules involving critical matters like promotions and safety. In healthcare workplaces, the safety of patients is also at stake along with the safety of employees. In contrast to mediation among litigating parties, labor negotiators cannot simply leave their dispute for a judge or jury to resolve; "the parties must preserve their relationship as much as possible since they have no choice but to coexist as long as the union has majority support." Kelleher Decl. ¶ 4. Private mediators are not a realistic alternative, either. "[T]he supply of private mediators is limited, and very few of them are as experienced in Labor-Management Collective Bargaining issues as FMCS mediators. In addition, private mediators are very expensive." *Id.* ¶ 7. For many disputes, there is simply no alternative to an FMCS mediator. And now, only five remain for the entire country.

## ARGUMENT

Plaintiffs seeking a preliminary injunction "must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When the federal government is a party, the last two factors merge." *New York*, 477 F. Supp. 3d at 294.

In this case, Plaintiffs have established all of these factors. The Court should grant Plaintiffs' motion and enter a preliminary injunction forbidding Defendants from dismantling FMCS, in violation of the APA and the separation of powers, and ordering them to return FMCS to the lawful status quo that existed before Executive Order No. 14238.

## I.    Plaintiffs Are Likely to Succeed on the Merits

The APA authorizes courts to review "final agency action" and "hold unlawful and set aside" those actions which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional . . . power," or "in excess of statutory . . . authority." 5 U.S.C. §§ 704, 706(2)(A)–(C). It also empowers reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

Defendants' actions have unlawfully dismantled and disabled FMCS, an independent agency that Congress has created and consistently funded to provide its statutorily mandated services. Defendants' actions violate multiple statutory provisions, unconstitutionally arrogate legislative powers to the executive, and unlawfully withhold agency action from the Plaintiffs, who abruptly lost the services of FMCS mediators as a direct result of Defendants' actions. To the minimal extent Defendants have attempted to justify their actions in stripping FMCS to a

skeleton staff, that explanation is arbitrary and capricious in further violation of the APA. For the same reasons, Defendants' actions violate the separation of powers, and this Court is empowered to enjoin such unconstitutional action.

### A.    Plaintiffs Have Article III Standing.

"To establish standing," the Supreme Court requires that a plaintiff "demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). The "injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon. And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.* at 381.

"A Union can assert standing on behalf of itself as an institution or on behalf of its members." *Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 853 (D.C. Cir. 2006). Plaintiffs here have institutional standing on their own behalf and on behalf of their members.

### 1.    Plaintiffs' Institutional Injury.

Plaintiffs UFT, SEIU Healthcare Minnesota, CIR SEIU, IAM District 160, UFCW Local 135, and AFSCME affiliate Council 31 were all in collective bargaining negotiations for expired contracts in March 2025. All were using the crucial assistance of an FMCS mediator to work through disputes that were irreconcilable without the mediator's assistance. Trager Decl. ¶¶ 5–9, 16–17; Gulley Decl. ¶¶ 5, 7; Dashefsky Decl. ¶ 8; Hemming Decl. ¶ 7; Walters Decl. ¶¶ 10–13; Thornton Decl. ¶¶ 10, 12. Because nearly all FMCS mediators were placed on immediate administrative leave on or around March 26, 2025, the mediators working with these Plaintiffs were forced to cancel their scheduled mediations with no advance notice. *See supra* p. 5–6. These Plaintiffs' negotiations immediately stalled, imperiling the parties' ability to reach

agreement. Trager Decl. ¶¶ 10–12, 18–19; Gulley Decl. ¶¶ 10–11, 16; Dashefsky Decl. ¶ 8–9,

13; Hemming Decl. ¶ 9; Walters Decl. ¶¶ 15–16[3]; Thornton Decl. ¶ 12. Virtually all of the labor

organizations affiliated with the AFL-CIO rely on FMCS's mediation and arbitration services,

and many have reported the same issues as the Plaintiffs here. Sharma Decl. ¶¶ 4–5.

Additionally, Plaintiff CIR SEIU has numerous rounds of collective bargaining coming up for

healthcare workers that would unquestionably have involved FMCS mediators, and which will

be substantially more difficult to conclude successfully without the assistance of an FMCS

mediator, whose services they now cannot obtain. Dashefsky Decl. ¶¶ 8–9, 12–13. And Plaintiff

UNAC/UHCP is scheduled to begin massive collective bargaining negotiations for healthcare

employees in less than a month at which three FMCS mediators were already scheduled to be

present—negotiations which will now be far more difficult. Guzynski Decl. ¶¶ 4–5, 7–9.

These plaintiffs' "bargaining position in all negotiations is fundamentally diminished"

without assistance from an FMCS mediator, because it is now far more likely "they will be

unable to ever reach a mutually binding contract." *Chertoff*, 452 F.3d at 853 (finding such

diminished bargaining power sufficient for Article III standing). As the Supreme Court has

recognized, "a denial of a benefit in the bargaining process can itself create an Article III injury,

irrespective of the end result." *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998) (citing

*Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993),

where contractors suffered an "injury in fact" based on a "harm . . . in the negotiation process"

for city contracts).

---

[3] On information and belief, the FMCS mediator assigned to UFCW Local 135's bargaining has
agreed to continue working with the parties as a private, paid mediator. The parties' choice to
continue under this arrangement indicates that they have concluded the mediator is irreplaceable,
but UFCW Local 135 is injured as it continues to pay for a mediator who, by statute, should
provide services to the parties without charge.

Plaintiffs IAM and AFGE have suffered a somewhat different, but no less concrete and imminent injury. IAM has current contracts that require the use of an FMCS mediator during the grievance and arbitration process. Shepherd Decl. ¶¶ 5–7. The signatory employer has refused to advance grievances to arbitration if FMCS mediation has not occurred. *Id.* ¶ 8. AFGE has hundreds of CBAs—agreed to by the federal government—that require the use of FMCS-appointed arbitrators in several circumstances. Glymph Decl. ¶ 3. AFGE also regularly uses FMCS mediators to advance or narrow negotiation impasses to the Federal Service Impasses Panel. *Id.* ¶ 5–6. Without FMCS's services, IAM and AFGE will be unable to enforce their contracts, thereby diminishing the services that they can provide their members and "weaken[ing] support for the union." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011) (concluding that a "diminished level of support" is an irreparable harm to the union if members believe "the benefits of unionization are lost").

### 2. Plaintiffs' Associational Injury on Behalf of Their Members.

Plaintiffs likewise assert an associational injury on behalf of their members because "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [Plaintiffs] seek[] to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (quotations omitted).

The Plaintiffs' members plainly would have standing. Multiple Plaintiffs have submitted declarations that their members are currently working under expired contracts (or negotiating for a first contract), and that agreements are unlikely in the near future without the assistance of an FMCS mediator or resort to economic weapons. Trager Decl. ¶¶ 8, 11, 15, 19; Walters Decl. ¶¶ 12, 15; Gulley Decl. ¶¶ 11, 16; Dashefsky Decl. ¶¶ 8–9, 12–13; Hemming Decl. ¶¶ 7, 9–10; Thornton Decl. ¶ 12. Every day that Plaintiffs' members work without the protection of a current

CBA, they "are denied the opportunity to achieve the economic benefits that a CBA can secure for workers." *Small*, 661 F.3d at 1191. And "[t]he value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost." *Id.* at 1192.

As for the second and third factors, Plaintiffs exist to represent their members. Bringing this lawsuit to restore the services of FMCS mediators to help Plaintiffs resolve labor disputes on behalf of their members is germane to member representation. And the relief Plaintiffs seek—to prevent the unlawful dismantling of FMCS—does not depend on the participation of individual members. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287–88 (1986) (union had standing to litigate "pure question of law" on behalf of its members).

### 3.  Causation and Redressability.

Defendants' actions in dismantling FMCS have plainly caused Plaintiffs' injuries. Plaintiffs' injuries would be directly redressed by the requested remedy to cease dismantling FMCS, return the agency to the status quo ante, and resume mediation services that were being provided before March 26. Compl., Prayer for Relief.

Plaintiffs therefore have Article III standing to bring their claims.

### B.  Defendants' Actions Dismantling FMCS Violate the APA (Counts I and II).

### 1.  Dismantling FMCS Is a Final Agency Action.

Defendants' conduct in dismantling FMCS and disabling it from providing required statutory services is final agency action, subject to judicial review under the APA. These actions "'mark the consummation of the agency's decisionmaking process,' and [are] 'one[s] by which rights or obligations have been determined, or from which legal consequences will flow.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997)).

*First*, Defendants' actions to disable FMCS from providing required services marks the consummation of the decisionmaking process. FMCS has closed all nine of its field offices across the country, except its headquarters in Washington, D.C. It has placed all but five mediators and approximately nine other staff on administrative leave beginning on March 26, and issued specific RIF notices to affected employees, effective on or around May 10. And, on information and belief, it has shut down all services, except that it will theoretically provide mediation in bargaining units of more than 250 employees in healthcare, and other private sector bargaining units of more than 1,000 employees (although even those services cannot possibly be provided by the five mediators who remain at the agency). In *Biden v. Texas*, 597 U.S. 785, 807 (2022), the Supreme Court held that an "attempt[] to terminate" an agency's programming constitutes "final agency action." The near "complete halt of agency [services]" and the fact that employees "will be terminated within weeks" establish "that these actions were final, and not tentative or interlocutory in nature." *Widakuswara v. Lake*, No. 25-CV-2390 (JPO), --- F. Supp. 3d ---, 2025 WL 945869, at *4 (S.D.N.Y. Mar. 28, 2025) (quotations omitted) (granting TRO against dismantling U.S. Agency for Global Media under Executive Order 14238).

*Second*, legal consequences will flow from Defendants' actions. The vast majority of FMCS employees will be terminated in the coming weeks. *See Widakuswara*, 2025 WL 945869, at *4. And Plaintiffs, along with numerous other unions and employers across the country, have abruptly lost FMCS's statutorily required services.

Defendants' actions to disable FMCS from providing its services amount to a final agency action reviewable under the APA.

### 2.    Dismantling FMCS Violates Section 706(2) of the APA.

By dismantling and disabling FMCS from providing its statutory functions, Defendants have violated Section 706(2) of the APA many times over.

### a. *Defendants' Actions Are Contrary to Law.*

*First*, Defendants' actions to hollow out FMCS's workforce leave the agency unable to perform its required statutory functions, violating the mandates of Congress. As a result of Defendants' actions, five mediators are now charged with providing the same services that, until a few weeks ago, were performed by 143 mediators. Those five mediators will not be able to provide the same services that FMCS provided before. Ramirez Decl. ¶ 27; Kelleher Decl. ¶ 9. Accordingly, Defendants have violated the statutes below in which Congress has given FMCS a duty to provide or make available services to parties in the private and federal sectors:

- The Taft-Hartley Act, Pub. L. No. 80-101, which directs that "[i]t shall be the *duty* of [FMCS] . . . to assist parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation," 29 U.S.C. § 173(a) (emphasis added);

- The Health Care Amendments of 1974, Pub. L. No. 93-360, which direct that "[w]henever the collective bargaining involves employees of a health care institution," and "notice [of a labor dispute] is given to [FMCS] . . . the Service *shall* promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement," *id.* § 158(d)(C) (emphasis added);

- The Labor Management Cooperation Act of 1978, Pub. L. No. 95-524, which "*direct[s]* [FMCS] to provide assistance" to employers and labor organizations in establishing and operating "plant, area and industrywide labor management committees," *id.* § 175a(a)(1) (emphasis added);

- The Civil Service Reform Act of 1978, Pub. L. No. 95-454, which requires that FMCS "*shall* provide services and assistances" to federal agencies and unions

13

representing federal employees "in the resolution of negotiation impasses,"

5 U.S.C. § 7119(a)–(b) (emphasis added).

These are unequivocal mandates. By using mandatory words like "duty," "direct," and "shall," the statutes have "imposed an obligation" on FMCS. *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) ("[T]he word 'shall' usually connotes a requirement." (quotations omitted)). As Judge Oetken recognized in temporarily enjoining the parallel dismantling of the U.S. Agency for Global Media ("USAGM"), an agency likely violates the mandates of its "governing statute" when it so drastically reduces its functions as to become a shell of its former self. *Widakuswara*, 2025 WL 945869, at *8. Just as 64 employees were "hardly sufficient" for USAGM to "carry out all of [its] statutory mandates," *id.*, it is ludicrous to believe that five mediators can perform the statutory mandates of FMCS, which, until a few weeks ago, were performed by a mediator staff of 143.

In addition, Congress has appropriated for fiscal years 2024 and 2025 almost $54 million for FMCS "to carry out the functions vested in it by the Labor-Management Relations Act, 1947 . . . ; the Labor-Management Cooperation Act of 1978; and . . . the Civil Service Reform Act." Compl. ¶¶ 75–77. By disabling FMCS from performing those statutory functions mere days after the most recently enacted appropriation, Defendants have violated Congress's command to spend such funds to carry out those statutory functions. "Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018). "Absent Congressional authorization," Defendants "may not redistribute or withhold properly appropriated funds in order to effectuate [their] own policy goals." *Id.* at 1235.

Defendants' actions are therefore "not in accordance with law." 5 U.S.C. § 706(2)(A).

14

   ***b. Defendants' Actions Are In Excess of Statutory Authority and Contrary
      to Constitutional Principles.***

For much the same reasons, Defendants' actions dismantling FMCS are "in excess of . . .

statutory authority," and "contrary to constitutional . . . power." 5 U.S.C. § 706(2)(B)–(C).

   *First*, Congress has given FMCS no authority to slash its required services. Congress

created FMCS as an independent agency more than 75 years ago and has repeatedly charged it

with statutory mandates. 29 U.S.C. § 172(a). Defendants are not free to disregard those

mandates. If Congress cannot delegate far more modest grants of regulatory authority through

"modest words," "vague terms," or "subtle devices," *West Virginia v. EPA*, 597 U.S. 697, 723

(2022), then Defendants surely lack any constitutional or statutory authority to cease their

statutorily mandated functions, or hollow out FMCS so dramatically that it lacks the capacity to

execute them, without any direction from Congress at all. But that is exactly what Defendants

have done.

   *Second*, Defendants' actions violate the Take Care Clause of the Constitution. Article II

provides that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art.

II, § 3. "Just as the Constitution prevents Congress from intruding on the President's power to

execute the laws, the President—and his subordinates—do not wield 'authority to set aside

congressional legislation by executive order.'" *State v. Trump*, No. 25-CV-01144 (JAV), --- F.

Supp. 3d ---, 2025 WL 573771, at *24 (S.D.N.Y. Feb. 21, 2025) (quoting *In re United Mine

Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999)). "[I]t has been the case for

centuries that neither the President, nor his executive branch, may unilaterally refuse to carry out

a congressional command." *Widakuswara*, 2025 WL 945869, at *6 (citing *Kendall v. U.S. ex rel.

Stokes*, 37 U.S. (12 Pet.) 524, 525 (1838) ("To contend that the obligation imposed on the

President to see the laws faithfully executed, implies a power to forbid their execution; is a novel

construction of the constitution, and entirely inadmissible.")). Congress could not have been

clearer: It has charged FMCS with numerous statutory mandates and appropriated the same

amount of funds year after year for FMCS to provide those services at consistent levels. "The

executive's job . . . is limited to 'tak[ing] Care' that such statutes be 'faithfully executed.'" *Id.* at

*7 (quoting U.S. Const. art. II, § 3). "Withholding congressionally appropriated funds, and

effectively shuttering a congressionally created agency simply cannot be construed as following

through on this constitutional mandate." *Id.*

 *Third*, and relatedly, Defendants' actions to dismantle FMCS violate the separation of

powers. Much like the dismantling of USAGM in *Widakuswara*, the cessation of nearly all

statutory functions necessarily implies the withholding of statutorily appropriated funds to

perform those functions. Indeed, that is precisely what the President has ordered. Executive

Order 14238 directs Defendant OMB and its Director, Defendant Russell Vought to "reject

funding requests for [FMCS] to the extent they are inconsistent with this order," Exec. Order

14238 § 2(c), an action which clearly defies congressional appropriations that were enacted at

essentially the same time as the Executive Order. In so doing, the "executive is usurping

Congress's power of the purse and its legislative supremacy." *Widakuswara*, 2025 WL 945869,

at *7. Although "a President sometimes has policy reasons . . . for wanting to spend less than the

full amount appropriated by Congress for a particular project or program," the "President does

not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261

n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *accord Trump*, 897 F.3d at 1232.

 More fundamentally, the Constitution gives power over "the establishment of offices

[and] the determination of their functions and jurisdiction" to Congress—not to the President or

any officer working under him. *Myers v. United States*, 272 U.S. 52, 129 (1926). Executive

agencies like FMCS "are creatures of statute," brought into existence by Congress. *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). The President and his officers may not abolish through executive fiat an agency created by statute. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Defendants' actions to dismantle FMCS and disable it from performing its statutory duties usurp constitutional powers that belong to Congress alone.

### c. Defendants' Actions Are Arbitrary and Capricious.

The APA "requires agencies to engage in 'reasoned decisionmaking,' and directs that agency actions be 'set aside' if they are 'arbitrary' or 'capricious.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16–17 (2020) (first quoting *Michigan* v. *EPA*, 576 U.S. 743, 750 (2015); then quoting 5 U.S.C. § 706(2)(A)). This requirement is not some box-checking exercise that an agency may ignore. "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

FMCS has not offered the public *any* reason for drastically slashing its services. In the absence of such reasoned decisionmaking, the public has been left with only two facts: (1) President Trump's Executive Order 14238, requiring FMCS to "reduce the performance of [its] statutory functions and associated personnel to the minimum presence and function required by law"; and (2) public reporting that FMCS has reduced to a "skeleton crew" with only five

mediators.[4] The only explanation FMCS has proffered to date is a contrived interpretation of its enabling statute, the Taft-Hartley Act, in RIF notices and the OPM waiver. *See* Exs. 1 & 2.

Under the Taft-Hartley Act, "[i]t shall be the duty of the [FMCS], in order to prevent or minimize interruptions of the free flow of commerce growing out of labor disputes, to assist parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." 29 U.S.C. § 173(a). Congress directed that FMCS "may proffer its services in any labor dispute in any industry affecting commerce, either upon its own motion or upon the request of one or more of the parties to the dispute, whenever *in its judgment* such dispute threatens to cause a substantial interruption of commerce." *Id.* § 173(b) (emphasis added). Neither statute nor regulation defines a "substantial interruption of commerce," thereby leaving that question to FMCS's appropriately delegated judgment.

Here, FMCS has not exercised "its judgment" to determine which disputes threaten to cause a substantial interruption of commerce. *Id.* Instead, DOGE and OMB have usurped that authority and used it to curtail FMCS's duties. In three unreasoned sentences, the RIF notices—which, on information and belief were directed by DOGE and OMB—state that "this RIF is necessary to implement President Donald Trump's Executive Order (s)" and because of "lack of work due to significant curtailment of duties." Ex. 1. That "significant curtailment of duties" results from "[t]he administration's interpretation of substantial impact to interstate commerce under Taft Hartley[, which] is when the dispute involves a bargaining unit of 1000 employees or

---

[4] Fed. News Network, *Federal labor mediation agency cuts staff down to 'skeleton crew'* (Mar. 26, 2025), https://federalnewsnetwork.com/workforce/2025/03/federal-labor-mediation-agency-cuts-staff-down-to-skeleton-crew/; Bloomberg, *Strike Risk Grows as Trump Cuts Labor Mediators from 143 to Four* (Apr. 8, 2025), https://news.bloomberglaw.com/us-law-week/strike-risk-grows-as-trump-cuts-labor-mediators-from-143-to-four. Although public reporting suggests that four mediators remain at FMCS, on information and belief, that number is actually five.

other metrics or instances *as the administration may determine* and communicate to FMCS." *Id.* (emphasis added).

Based on the *administration's* purported change in "interpretation" of Taft-Hartley, FMCS has placed 138 of its mediators on administrative leave and scheduled them for termination. As a result, employers and unions like Plaintiffs across the country abruptly lost FMCS services. Under this new interpretation, employers and employees in healthcare bargaining units with fewer than 250 employees, *see supra* p. 5, and nonhealthcare bargaining units with fewer than 1,000 employees, will never obtain the services of an FMCS mediator, no matter the threat to interstate commerce.

The first problem with this new interpretation is that it flagrantly disregards applicable law. The healthcare sector threshold of 250 or more bargaining unit employees violates Congress's statutory command that "[w]henever the collective bargaining involves employees of a health care institution," and "notice [of a labor dispute] is given to [FMCS] . . . the Service *shall* promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement." 29 U.S.C. § 158(d)(C) (emphasis added). There is no room for a numerical threshold in that statutory command.

The second problem is that the thresholds are not based on the judgment of FMCS. The notice of this decision attributes these thresholds to "the administration." Exs. 1 & 2. Under Taft-Hartley, however, it is the judgment of FMCS, not the judgment of "the administration," that must support any limit on FMCS's services based on a lack of substantial impact on interstate commerce. 29 U.S.C. § 173(b).

The third problem is that, even if the new interpretation had been the product of FMCS's judgment, it is the very definition of arbitrary and capricious decisionmaking. Defendants gave

no reasons whatsoever for the number of employees that a bargaining unit must contain for FMCS to provide its services, either in the healthcare sector specifically or in the private sector otherwise. The law requires that *all* unions in industries affecting interstate commerce—regardless of bargaining unit size—notify FMCS of labor disputes and pending strikes, so that FMCS can decide whether to provide its services; the very structure of the law is inconsistent with the notion that it is appropriate for FMCS to determine its services based on bargaining unit size. 29 U.S.C. §§ 158(d), (g). Further, the new interpretation fails to recognize that multiple bargaining units—which may have fewer than 1,000 employees individually but total to several thousand employees in the aggregate—are often covered by a multi-unit CBA or by multiple CBAs negotiated in coalitional bargaining. This is true, for example, for the grocery store employees at Albertson's represented by multiple UFCW locals, and the healthcare workers at Kaiser Permanente represented by Plaintiff UNAC/UHCP. Walters Decl. ¶¶ 6–7; Guzynski Decl. ¶¶ 3–4. Under the administration's new interpretation, if a dispute arises in such coalitional or multi-unit bargaining—which dispute undoubtedly would have an impact on interstate commerce—FMCS could not provide mediation services.

The fourth problem, as explained by two longtime FMCS employees, is that there is simply no way that *five* mediators could mediate even the disputes of healthcare bargaining units over 250 employees or other private-sector bargaining units of over 1000 employees, particularly given the mediators' other statutory responsibilities. Ramirez Decl. ¶¶ 24, 27; Kelleher Decl. ¶ 9. Such large disputes are exceptionally complicated and require intensive preparation on the part of the mediator. Thus, even if (contrary to fact) FMCS itself had made a reasoned interpretation of the statute, the plan it has enacted would still not allow FMCS to fulfill its statutory duties.

Simply put, "[t]here are no findings and no analysis" in FMCS's explanation for dismantling its services, or reducing the mediator staff to five mediators, let alone "any rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). To satisfy basic APA review, any "reasoned explanation" must reflect "consideration of the relevant factors," including "the advantages *and* the disadvantages of agency decisions." *Michigan*, 576 U.S. at 753. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, it is obvious—both from the face of the new interpretation and the rushed nature of its implementation—that the agency has found no facts, gathered no data, and made no reasoned conclusions. The only proffered reason is a circular one: FMCS must be cut because the President has directed that it be cut. That direction, of course, plainly violates the separation of powers. *See supra* pp. 16–17.

Finally, even if the new interpretation were based on something other than a contrived attempt to shutter an agency created by statute, such a dramatic "change[ in] course" in providing agency services must account for the fact that the agency's "longstanding" services "may have engendered serious reliance interests." *Regents of Univ. of Cal.*, 591 U.S. at 30 (quotations omitted). It is "arbitrary and capricious to ignore such matters." *Id.* (quotations omitted); *accord Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. ---, 145 S. Ct. 898, 917 (2025) (further outlining "change-in-position doctrine," which holds that "agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests" (cleaned up)).

Contrary to the Supreme Court's clear teachings, the new interpretation did not even acknowledge that it was pulling the rug out from employers and unions across the country who have relied on the services of FMCS mediators for years. It did not consider the disadvantages in shuttering FMCS services for parties like Plaintiffs who regularly turn to FMCS mediators to help resolve thorny disputes and to avoid strikes or lockouts that undoubtedly affect commerce. Nor did the new interpretation consider the effect on parties who are *required* to use FMCS services under their existing CBAs, like Plaintiffs IAM and AFGE. *See* Shepherd Decl. ¶¶ 5–9; Glymph Decl. ¶¶ 3, 6. Looming over all this is the glaring fact that there is simply *no need* to cut FMCS's services, which have reaped $500 million in cost savings each year on a mere budget of $54 million.

In short, the new interpretation purporting to justify the unconstitutional dismantling of FMCS is precisely the type of "contrived reason[]" that the Supreme Court has explained "would defeat the purpose of the [administrative review] enterprise." *Dep't of Com.*, 588 U.S. at 785. "If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case." *Id.*

### 3. Defendants Have Unlawfully Withheld Agency Action from Plaintiffs, in Violation of Section 706(1) of the APA.

The APA further empowers courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). FMCS has unlawfully withheld its required services from Plaintiffs by immediately placing nearly all its mediators on administrative leave with no notice or warning—forcing those mediators to suddenly withdraw from active negotiations. The Court here can compel FMCS to provide its unlawfully withheld

services because such services are "demanded by law (which includes, of course, agency regulations that have the force of law)." *Id.* at 65.

The law requires that "[w]henever [FMCS] does proffer its services in any dispute, it shall be the duty of the Service promptly to put itself in communication with the parties and to use its best efforts, by mediation and conciliation, to bring them to agreement." 29 U.S.C. § 173(b); *accord* 29 C.F.R. § 1403.4 ("[FMCS] will assign one or more mediators to each labor-management dispute in which it has been determined that its services should [be] proffered."). In other words, where FMCS has started providing its services, it may not withdraw them until "its best efforts . . . to bring [the parties] to agreement" have been exhausted. But that is exactly what Defendants have done. Plaintiffs UFT, SEIU Healthcare Minnesota, CIR SEIU, IAM District 160, UFCW Local 135, and AFSCME affiliate Council 31 each immediately lost scheduled services of an FMCS mediator as a result of Defendants' unlawful actions. *Supra* p. 5–6.

The law likewise requires FMCS to provide its services to parties in a labor dispute in the healthcare sector. 29 U.S.C. § 158(d)(C). But once again, Defendants have withheld those services. Plaintiffs IAM District 160, SEIU Healthcare Minnesota, and AFSCME affiliate Council 31 each represent healthcare workers, and have either lost, or been unable to obtain, the services of an FMCS mediator to assist with their labor disputes, which will likely cause a strike or lockout. Hemming Decl. ¶¶ 8–10; Gulley Decl. ¶¶ 7–16; Thornton Decl. ¶¶ 10–12.

Defendants have therefore unlawfully withheld agency action, violating Section 706(1) of the APA.

### C.    Defendants' Actions Dismantling FMCS Violate the Separation of Powers (Count III).

For the same reasons discussed in Part I.B.2.b., Defendants' actions dismantling FMCS violate the separation of powers. Beyond the APA, this Court is equitably empowered to enjoin

and declare unlawful official action that violates the Constitution. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *see also Nat'l Treasury Emps. Union v. Vought*, No. CV 25-0381 (ABJ), --- F. Supp. 3d ---, 2025 WL 942772, at *40 (D.D.C. Mar. 28, 2025).

Neither the President nor his subordinates have authority to dismantle a legislatively created agency, to disregard its statutory mandates, or refuse to spend its appropriated funds. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

## II. Absent Preliminary Relief, Plaintiffs Are Likely to Suffer Irreparable Harm

To establish irreparable harm, a plaintiff "must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages." *NAACP, Inc. v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995). Plaintiffs face likely and imminent irreparable harm for three reasons.

*First*, multiple Plaintiffs abruptly lost the services of FMCS mediators because of Defendants' actions, resulting in stalled negotiations and no successor CBAs. *See supra* pp. 5–6, 8–9. Plaintiffs' members thus continue to work without a current CBA. Every day, they "are denied the opportunity to achieve the economic benefits that a CBA can secure for workers." *Small*, 661 F.3d at 1191. And "[t]he value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost." *Id.* at 1192.

*Second*, Plaintiffs' negotiations with employers are likely to drag on and deadlock without the services of an FMCS mediator. *Supra* pp. 10–11. And as courts have regularly recognized, "a delay in bargaining weakens support for the union." *Id.* (concluding such

weakened support constitutes irreparable harm). Indeed, "time is usually of the essence in labor disputes." *Frankl v. HTH Corp.*, 650 F.3d 1334, 1340 (9th Cir. 2011) (cleaned up). "Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining." *Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970). "As time passes, the benefits of unionization are lost . . . [t]he deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996). As the Second Circuit has recognized in a related context, by the time an employer may finally come around to make progress in negotiations, the "union's position in the plant may have already deteriorated to such a degree that effective representation is no longer possible." *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975).

*Third*, once parties reach an impasse in negotiations, they may resort to their economic weapons of a strike or a lockout, disrupting labor peace. For Plaintiffs UFT, SEIU Healthcare Minnesota, and AFSCME affiliate Council 31, for instance, negotiations have so broken down that there is now a daily threat that the employer will walk away from the bargaining table and lock out Plaintiffs' members until they agree to less favorable terms. Trager Decl. ¶¶ 11, 19; Gulley Decl. ¶ 11; Thornton Decl. ¶¶ 12, 22. There is no "retroactive remedy for the harm to industrial peace that occurs during the period that the employer refuses to bargain," much less the loss of a "variety of benefits" that a mediated agreement "might otherwise have secured." *Small*, 661 F.3d at 1192.

These irreparable harms were far less likely when FMCS mediators were at the bargaining table. For Plaintiff UFT's negotiations at Merrick Academy Charter School in New York, the FMCS mediator brought "progress" to the negotiations "almost immediately" by

"get[ting] both sides to move" on issues for which they had previously deadlocked, and "getting the parties to be open to creative compromises on contentious issues." Trager Decl. ¶¶ 6–7. Over nine bargaining sessions in six months, the FMCS mediator "built relationships with both parties" and "gained an intimate knowledge of [their] specific circumstances and associated disputes." *Id.* ¶¶ 9, 11. Without the FMCS mediator, UFT "seriously doubt[s] that the parties will be able to reach an agreement . . . and bargaining will continue to drag on with a strike or lockout possibility increasing every day." *Id.* ¶ 11. And a private mediator—who comes at a much higher cost—cannot replace an FMCS mediator, who works the long hours needed to conclude many labor negotiations without charging an hourly rate. *Id.* ¶¶ 8, 11; *see also id.* ¶¶ 15–16 (describing how a "private mediator did not help the parties make any progress in negotiations" in contrast with the FMCS mediator who "immediately" fostered progress); *see also* Kelleher Decl. ¶ 7.

Indeed, "for decades," a team of FMCS mediators has "been an integral part" of national bargaining between a coalition of healthcare unions, including Plaintiff UNAC/UHCP, that bargain with Kaiser Permanente for a national agreement covering 60,000 healthcare workers. Guzynski Decl. ¶¶ 4–5. FMCS mediators are typically present throughout bargaining, and in the last round of bargaining in 2021, they "worked tirelessly in the weeks leading up to the expiration of the national agreement" and were "integral" to a "last-minute deal that avoided a strike that would have been enormously disruptive to healthcare." *Id.* ¶¶ 4–6. FMCS had planned to assign a team of three or more mediators to facilitate this year's negotiations beginning May 5; without those mediators, bargaining "will be substantially more difficult." *Id.* ¶¶ 7–9. After all, "FMCS mediators have been deeply involved in these contracts for decades; they know the parties, know the issues, and bring unparalleled expertise and judgment to the bargaining table." *Id.* ¶ 9. Every unproductive bargaining session without an FMCS mediator constitutes an

immeasurable and irreparable harm to Plaintiff UNAC/UHCP, bringing its members one day closer to an expired contract.

In sum, each of the declarations Plaintiffs have provided attest to the valuable services of FMCS mediators. Losing those services has left Plaintiffs in the lurch, to their detriment as representational institutions and to the detriment of their members. "Those harms cannot be remedied with mere money damages." *Widakuswara*, 2025 WL 945869, at *9.

## III.    The Balance of Equities and the Public Interest Favor Preliminary Relief

The last two factors of the preliminary injunction analysis merge when the federal government is a party. *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 224 (2d Cir. 2021). The Court must therefore "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief . . . pay[ing] particular regard for the public consequences" that would result in granting the emergency relief sought. *Winter*, 555 U.S. at 24.

The balance of the equities here favor Plaintiffs. Plaintiffs have demonstrated the harms they face absent preliminary relief. *See supra* pp. 5–6, 8–11, 24–27. The potential consequences to the public of a lockout or strike affecting hundreds or thousands of healthcare workers, grocery workers, or teachers are enormous. On the other side of the scale, granting emergency relief will not harm the government's interests. As Judge Oetken recognized in *Widakuswara*, the balance of equities undoubtedly tips against the government when preliminary relief "merely requires what is already statutorily mandated." 2025 WL 945869, at *10. And "there can be no doubt that the public interest favors requiring the government to comply with the law." *Velesaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2020).

**<u>CONCLUSION</u>**

Plaintiffs respectfully request that the Court grant their Motion for a Preliminary

Injunction; enjoin Defendants' actions dismantling FMCS; and order Defendants to restore the

status quo before the President's Executive Order, including providing the mediation services

FMCS has unlawfully withheld from Plaintiffs.


Dated: April 16, 2025

*/s/ Elisabeth Oppenheimer*
Elisabeth Oppenheimer*
(*Lead Trial Counsel*)
Cole Hanzlicek**
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth St, N.W., Suite 1000
Washington, D.C. 20005
(202) 842-2600
(202) 842-1888 (fax)
eoppenheimer@bredhoff.com
chanzlicek@bredhoff.com

*Counsel for Plaintiffs*

*Admitted *pro hac vice*
**Pro hac vice* Application Pending

**<u>CERTIFICATION OF WORD COUNT COMPLIANCE</u>**

Case Caption: American Federation of Teachers, AFL-CIO, *et al.* v. Goldstein, *et al.*

Case No: 1:25-cv-03072-AS

      As required by Rule 7.1(c) of the Joint Local Rules, S.D.N.Y. and E.D.N.Y., I certify the document contains 8,499 words excluding the parts of the document that are excepted by the rule.

      I declare under penalty of perjury that the foregoing is true and accurate.


Dated: April 16, 2025            */s/ Elisabeth Oppenheimer*
                             Elisabeth Oppenheimer
                             BREDHOFF & KAISER, P.L.L.C.