IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN FEDERATION OF TEACHERS, AFL-CIO; UNITED FEDERATION OF TEACHERS; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; SEIU HEALTHCARE MINNESOTA & IOWA; SEIU COMMITTEE OF INTERNS AND RESIDENTS; UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO; UFCW LOCAL 135; INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO; IAM DISTRICT 160; AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO; UNITED NURSES ASSOCIATIONS OF CALIFORNIA/UNION OF HEALTH CARE PROFESSIONALS; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; and AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,<br><br>    PLAINTIFFS,<br><br>v.<br><br>GREGORY GOLDSTEIN, in his official capacity as Acting Director of the Federal Mediation and Conciliation Service; FEDERAL MEDIATION AND CONCILIATION SERVICE; UNITED STATES OF AMERICA; UNITED STATES OFFICE OF MANAGEMENT AND BUDGET; and RUSSELL T. VOUGHT, in his official capacity as the Director of the Office of Management and Budget,<br><br>    DEFENDANTS. | Case No.: 1:25-cv-03072-AS<br><br>**DECLARATION OF JAVIER RAMIREZ** |

## DECLARATION OF JAVIER RAMIREZ

1. My name is Javier Ramirez. I am over the age of 18 and make this declaration based on my personal knowledge.

2. I became a mediator at FMCS in 2005. As an FMCS mediator, I assisted parties in negotiating collective-bargaining agreements ("CBAs") in numerous industries, including healthcare, performing arts, public safety, education, hospitality, manufacturing, construction, and others.

3. Before I became an FMCS mediator, I spent over fourteen years in labor relations, negotiating contracts and resolving disputes.

4. In June 2021, 2022, and 2023, President Biden nominated me to be the 20th Director of FMCS, although the Senate never voted on my nomination. My last position at FMCS was the Deputy Director for Field Operations. In that role, I oversaw all U.S. federal mediators.

5. Because employers and unions necessarily have long-term relationships, mediation in the collective-bargaining context is very different than mediation in the litigation context. In contrast to mediation between litigation parties, labor negotiators do not have an option of simply leaving their dispute to be resolved by a judge or jury. Rather, the parties must find a way to negotiate a CBA that will govern employees' terms and conditions of employment. They must avoid strikes and lockouts if at all possible, and they must preserve their relationship during and after negotiations, since they will have to coexist as long as the union has majority support.

6. As an FMCS mediator, I prepared extensively for collective bargaining mediations. Showing up at a negotiation session without that preparation would not have been productive, and might well have been counterproductive.

7. The first step in my preparations was to engage with the parties and begin to build the relationship, while learning the roles of each participant; determining who had decision-making authority; and making an assessment of where the inter- or intra-party conflicts existed. These initial communications were the time to set expectations and display a neutral, problem-solving outlook. Also during these initial conversations, I would begin to assess what the significant disputes or sticking points were likely to be.

8. For many negotiations, I would also have to do research and deep-dive analysis into the industry, the employer, or the geographic area. For instance, to assist with negotiations in the performing arts, I would have to learn about the employer's funding sources, performance scheduling, and the particular skills that were required for performers. To assist in negotiations in professional sports, I would have to learn about the structure of players' contracts, salary caps, luxury tax issues, free agency, and arbitration. In education, I would have to learn about the different pay scales, benefits,

1

and duties of different types of professionals.  In any area, understanding the exact composition of the bargaining unit was critical.

9.  I also needed to understand relevant legal issues.  For instance, I needed to constantly stay on top of recent decisions of the National Labor Relations Board, court rulings, Federal Labor Relations Authority rulings, or Executive Orders that could influence bargaining.  Some states would have sunshine laws (transparency requirements) or unusual labor or budgeting laws that could play into negotiations.

10.  Beyond the legal and economic factors, I needed to talk to the parties enough to understand and assess the emotional issues:  identity-based or ideological principle-driven demands, or "pet" issues that defied logic but mattered deeply to the parties.

11.  As part of my preparation, I might also need to review the existing CBA (if there was one), the proposals exchanged, and the list of open issues.  I would also need to attend to logistical issues, such as ensuring that the parties had a space that was conducive to negotiations (breakout rooms for each party, etc.).

12.  When the parties were negotiating a first contract, and thus had no prior history or agreement to draw on, negotiations were often more difficult and contentious.  This is especially true because first-contract bargaining often follows a heated and emotional organizing campaign, and may involve an employer or an industry that is unused to collective bargaining.  Thus, my preparations might be more involved for first-contract bargaining.  Bargaining for a successor contract, however, could come with its own complications, depending on how frequently bargaining had occurred, how past bargaining had gone, and whether there was a history of actions like strikes or lockouts.

13.  Once I had gathered enough information about the particular parties, the contract, the industry, and the geographic area, as part of my mediation preparation, I would develop a Most Likely Alternative to a Negotiated Agreement (MLATNA), which is similar to the traditional BATNA (Best Alternative) and WATNA (Worst Alternative) concepts.  These projections are based on the specific facts of the contract, parties, industry, and geographic region.  They help the mediator understand the likely outcomes if negotiations break down—what each side realistically stands to gain or lose.  This insight is critical for shaping strategy, framing risk, and identifying where perception may not match reality.  I did not share these directly with the parties, but they guided my interventions.  These models help test positions, temper unrealistic expectations, and highlight the potential costs of impasse, and they help mediators stay focused on outcomes, maintain neutrality, and support the parties in making informed, forward-looking decisions.  When parties are stuck, I can use this framework to ask informed questions that gently move them toward resolution.  Preparation of the MLATNA typically took a half to full day, depending on the complexity of the bargaining relationship and number of open issues.

14.  Given all the tasks described above, I would estimate that I typically spent eight hours preparing for a negotiation of ordinary complexity, and sixteen hours

preparing for a negotiation of unusual complexity, although these hours could vary substantially. Based on decades of conversations with other mediators, I believe these numbers are typical. Note that these estimates do not include the regular check-ins identified in paragraph 7 above, which take place over a 2-4 month period. The time estimate in this section is time spent preparing for a case once I believed that I would go active in a case—in other words, when it was time to convert from monitoring to mediating.

15. During the negotiations, I would give an opening presentation that would set the tone of the negotiation and my participation, reaffirm confidentiality, and set ground rules. Another critical early task included inoculating against disruptive behavior (for instance, by bringing the parties to agreement on how to handle the media).

16. During the negotiations and between negotiation sessions, I would constantly re-assess inter- and intra-party relationships, the strength of the parties' positions, where the crucial disputes were, and where there might be room to compromise. I would pay attention, for instance, to any red flags among the leadership teams or negotiating committees, such as infighting, inability to close, or public posturing. I also spent a great deal of time trying to think of creative proposals that could move the parties closer, or new processes that might break a deadlock. I would monitor media and websites to understand how the dispute was playing in the press and with their constituents, and how that might affect parties' leverage and flexibility.

17. Negotiations could involve very long hours, particularly as the contract expiration deadline neared or a strike or a lockout became more likely. It was critical that I be with the parties in-person during these long hours to go back and forth between them with proposals on numerous different subjects and help move each party closer to a compromise. If I regularly had to leave negotiations close to a contract expiration deadline, I would not have been able to keep up with the constantly changing landscape and would not have been able to be effective.

18. Before my time as a federal mediator, I negotiated labor agreements as an advocate for 14+ years. During that time, I saw firsthand the value a federal mediator brings to the table—from early-stage training and setting expectations to de-escalating tense moments in high-stakes negotiations. A federal mediator's presence brings structure, focus, and a level of professionalism that often shifts the dynamic in a positive direction. I've been in rooms where a strike felt imminent, and it was only the intervention of a skilled federal mediator that prevented a breakdown. Their ability to reframe issues, test positions, and provide a neutral sounding board allows advocates to explore solutions without undermining their credibility or internal leverage.

19. Federal mediators also bring legitimacy to the process—just their presence often puts everyone on their best behavior and resets the tone of the negotiation. They manage the process so the parties can focus on substance, provide confidential spaces to float ideas, and help both sides evaluate the risks and consequences of impasse versus agreement. That support is invaluable to the parties and their advocates. It protects

relationships, improves outcomes, and often makes the difference between prolonged conflict and timely resolution. This is exactly why I transitioned from an advocate to a neutral.

20. Mediation is especially critical in the healthcare industry due to the high stakes, strict regulatory timelines, and the immediate impact labor disputes can have on patient care and public safety. Under Section 8(g) of the National Labor Relations Act, healthcare unions are required to give employers and FMCS at least 10 days' notice before engaging in a strike, picketing, or other concerted refusal to work. This notice triggers an urgent window for mediation, where a federal mediator can step in to help the parties resolve outstanding issues and avoid a disruptive labor action. Labor disruptions in healthcare don't just affect operations—they directly threaten patient well-being. Hospitals and long-term care facilities must make immediate contingency plans, which often involve moving vulnerable patients, reducing services, or entering into expensive temporary staffing contracts to cover for striking nurses or healthcare workers. These emergency measures are not only costly and logistically complex, but also risk degrading the quality of care. This crucial 10-day window gives employers a chance to maintain continuity of care and helps unions achieve their goals without putting patients at risk. In healthcare, mediation is absolutely essential for the system to function.

21. In addition to my work on collective-bargaining mediations, I also spent time as a mediator fulfilling the statutory mandate to provide assistance to employers and unions in establishing labor-management committees. This often involved providing trainings, and sometimes required me to help an employer and a union understand that a labor-management committee might be a good fit for their issues, and to assist them with the details of setting up such a committee. I estimate that these duties took up approximately 35% percent of my time when I was a mediator.

22. I also provided mediation to federal parties to try to avoid impasse, or narrow the issues that the Federal Service Impasses Panel would have to decide, and I provided the required mediation to the Postal Service in disputes. I estimate that these duties took up 15% percent of my time when I was a mediator.

23. During my time at FMCS, I am not aware of any instance when FMCS was unable to provide requested mediation assistance solely due to lack of FMCS resources.

24. For six years, I was in management at FMCS, dealing with staffing mediators on projects. Based on my own experience as a mediator, and my experience in management, there is no operationally viable way that five mediators can manage the current volume and complexity of FMCS's private-sector caseload, even if services are restricted to only the largest disputes—those involving 1,000+ employees in most industries and 250+ in healthcare. Large cases are not only more complex, they are significantly more time-consuming, often requiring weeks of monitoring and preparation, multi-day sessions, and extensive follow-up. These cases frequently involve national employers, multiple unions, and high-stakes economic issues, all of which demand sustained mediator engagement—not one-off interventions.

25. Healthcare alone represents over 35% of FMCS's caseload, with almost 4,000 meetings annually. Under the NLRA's 8(g) notice requirement, healthcare unions must give only 10 days' notice before striking, forcing rapid deployment and immediate action. These are not routine assignments—they often require mediators to be on-site, available at all hours, and well-versed in the region's healthcare infrastructure. The cost and disruption for employers in the event of a labor stoppage are enormous, including relocating patients, canceling procedures, and securing temporary staffing through expensive emergency contracts. The stakes in these cases demand timely, hands-on mediation—not delayed or remote support.

26. Adding to the challenge, FMCS's remaining mediators are all based in Washington, D.C., while the highest concentration of disputes is on both coasts and throughout the Midwest. This geographic mismatch will create constant travel demands, with no slack for overlapping cases or urgent deployments. Co-mediation is common in large private-sector disputes, which means even fewer mediators are available at any given time. Simply put, five mediators cannot sustain a national labor relations system of this scale. The result would be significant delays, increased labor disruptions, and a breakdown in employer-union engagement across the country.

27. In addition, with only five mediators, it would be essentially impossible to assign mediators to disputes based on their prior experience with the industry, the parties, or other relevant factors that could not be taken into account with such a small staff. This would significantly diminish the quality of the services FMCS could provide. The result would not be a scaled-down FMCS—it would be a symbolic shell of the agency, unable to deliver on its statutory mission or public trust.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Javier Ramirez

Dated: 4/15/2025