**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| AMERICAN FEDERATION OF TEACHERS, AFL-CIO; UNITED FEDERATION OF TEACHERS; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; SEIU HEALTHCARE MINNESOTA & IOWA; SEIU COMMITTEE OF INTERNS AND RESIDENTS; UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO; UFCW LOCAL 135; UFCW LOCAL 2013; INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO; IAM DISTRICT 160; AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO; AFSCME COUNCIL 31; UNITED NURSES ASSOCIATIONS OF CALIFORNIA/UNION OF HEALTH CARE PROFESSIONALS; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; and AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, <br><br> PLAINTIFFS, <br><br> v. <br><br> GREGORY GOLDSTEIN, in his official capacity as Acting Director of the Federal Mediation and Conciliation Service; FEDERAL MEDIATION AND CONCILIATION SERVICE; UNITED STATES OF AMERICA; UNITED STATES OFFICE OF MANAGEMENT AND BUDGET; and RUSSELL T. VOUGHT, in his official capacity as the Director of the Office of Management and Budget, <br><br> DEFENDANTS. | Case No. 1:25-cv-03072-AS <br><br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> **ORAL ARGUMENT REQUESTED** |

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES...............................................................................................ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................... 2

    A.   FMCS's Functions ................................................................................... 2

    B.   FMCS's Recent Staffing and Funding ................................................... 3

    C.   DOGE's Descent on FMCS .................................................................... 3

    D.   Plaintiffs' Loss of FMCS Services ........................................................ 7

LEGAL STANDARD ....................................................................................................... 8

ARGUMENT ..................................................................................................................... 9

    I.    Plaintiffs Have Article III Standing. ..................................................... 9

         A.   Plaintiffs' Institutional Injury.................................................... 10

         B.   Plaintiffs' Associational Injury on Behalf of Their Members. ................. 13

         C.   Causation and Redressability.................................................... 14

    II.   Defendants' Action Violates the APA. .................................................. 14

         A.   Slashing FMCS's Services Is a Final Agency Action.................. 14

         B.   FMCS's Action Violates Section 706(2) of the APA.................. 15

            i.    Defendants' Action To Slash FMCS's Services Is Arbitrary and Capricious... 15

            ii.   Defendants' Action Is Contrary to Law. ........................... 19

            iii.  Defendants' Action Is In Excess of Statutory Authority and Contrary to Constitutional Power. ........................................ 23

         C.   Defendants Have Unlawfully Withheld Agency Action from Plaintiffs, in Violation of Section 706(1) of the APA.................... 24

    III.  Defendants' Action to Disable FMCS from Fulfilling Its Statutory Functions Violates the Separation of Powers and Is Ultra Vires. ....................... 25

    IV.  The Court Should Set Aside Defendants' Unlawful Action................... 27

CONCLUSION.................................................................................................................. 28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ...............................................................22, 23, 26

*Am. Fed'n of Gov't Emps. v. Trump*,
    2025 WL 1482511 (N.D. Cal. May 22, 2025) .......................................................26

*Am. Fed'n of Gov't Emps. v. Trump*,
    2025 WL 1541714 (9th Cir. May 30, 2025) ........................................................9, 26

*Amerijet Int'l, Inc. v. Pistole*,
    753 F.3d 1343 (D.C. Cir. 2014) ...........................................................................17

*Bd. of Trs. of Bakery Drivers Loc. 550 & Indus. Pension Fund v. Pension Benefit Guar. Corp.*,
    136 F.4th 26 (2d Cir. 2025) ...................................................................................8

*Bennett v. Spear*,
    520 U.S. 154 (1997) .............................................................................................14

*Biden v. Texas*,
    597 U.S. 785 (2022) .............................................................................................15

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) .............................................................................................17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...............................................................................................8

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) .............................................................................22

*Clinton v. City of New York*,
    524 U.S. 417 (1998) .........................................................................................11, 24

*Comprehensive Cmty. Dev. Corp. v. Sebelius*,
    890 F. Supp. 2d 305 (S.D.N.Y. 2012) ..................................................................16

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    603 U.S. 799 (2024) ........................................................................................14, 27

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ....................................................................................16, 17, 28

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ....................................................................................15, 18

*Emhart Indus., Hartford Div. v. NLRB*,
    907 F.2d 372 (2d Cir. 1990) ............................................................................11

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ..........................................................................................9

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
    145 S. Ct. 898 (2025) ......................................................................................18

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ........................................................................................26

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ........................................................................................12

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v.*
    *Brock*,
    477 U.S. 274 (1986) ........................................................................................14

*Irish Lesbian & Gay Org. v. Giuliani*,
    143 F.3d 638 (2d Cir. 1998) ............................................................................13

*Karp Metal Prods. Co.*,
    51 NLRB 621 (1943) ......................................................................................13

*Kendall v. U.S. ex rel. Stokes*,
    37 U.S. (12 Pet.) 524 (1838) ...........................................................................23

*Maine Cmty. Health Options v. United States*,
    590 U.S. 296 (2020) ........................................................................................19

*Michigan v. EPA*,
    576 U.S. 743 (2015) ............................................................................15, 16, 17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..........................................................................................17

*Myers v. United States*,
    272 U.S. 52 (1926) ..........................................................................................24

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
    595 U.S. 109 (2022) ........................................................................................24

*Nat'l Treasury Emps. Union v. Chertoff*,
    452 F.3d 839 (D.C. Cir. 2006) ...................................................................10, 11

*Nat'l Treasury Emps. Union v. Vought*,
　　2025 WL 942772 (D.D.C. Mar. 28, 2025)........................................................9, 26

*Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*,
　　508 U.S. 656 (1993)....................................................................................11

*New York v. McMahon*,
　　2025 WL 1463009 (D. Mass. May 22, 2025) .................................................9, 27

*New York v. U.S. Dep't of Homeland Sec.*,
　　969 F.3d 42 (2d Cir. 2020)...........................................................................12

*NLRB v. Nexstar Media Inc.*,
　　133 F.4th 201 (2d Cir. 2025) ........................................................................15

*NLRB v. WPIX, Inc.*,
　　906 F.2d 898 (2d Cir. 1990)..........................................................................11

*Norton v. S. Utah Wilderness All.*,
　　542 U.S. 55 (2004)......................................................................................25

*Rhode Island v. Trump*,
　　2025 WL 1303868 (D.R.I. May 6, 2025) ................................................. *passim*

*SEC v. Chenery Corp.*,
　　318 U.S. 80 (1943)......................................................................................16

*Small v. Avanti Health Sys., LLC*,
　　661 F.3d 1180 (9th Cir. 2011) .......................................................................13

*UFCW Local 751 v. Brown Group, Inc.*,
　　517 U.S. 544 (1996)....................................................................................10

*West Virginia v. EPA*,
　　597 U.S. 697 (2022)....................................................................................23

*Widakuswara v. Lake*,
　　2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) ............................................. *passim*

*Widakuswara v. Lake*,
　　2025 WL 1166400 (D.D.C. Apr. 22, 2025).......................................................22

*Youngstown Sheet & Tube Co. v. Sawyer*,
　　343 U.S. 579 (1952)....................................................................................26

**Statutes & Regulations**

5 U.S.C. § 701.........................................................................................................1

iv

5 U.S.C. § 704 ................................................................................................................14

5 U.S.C. § 706 ........................................................................................................ *passim*

5 U.S.C. § 7119 ..............................................................................................................19

29 U.S.C. § 158 ..........................................................................................1, 19, 20, 25

29 U.S.C. § 172 ................................................................................................................2

29 U.S.C. § 173 ...................................................................................................... *passim*

29 U.S.C. § 175 ..............................................................................................................19

Taft-Hartley Labor Management Relations Act of 1947, Pub. L. No. 80-101 ........................2, 19

Health Care Amendments of 1974, Pub. L. No. 93-360 ...............................................19

Civil Service Reform Act of 1978, Pub. L. No. 95-454 ................................................19

Labor Management Cooperation Act of 1978, Pub. L. No. 95-524 ..............................19

Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47 ......................22

Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4 ..........3, 22

29 C.F.R. § 1403.4 .........................................................................................................25

**Other Authorities**

U.S. Const. art. II, § 3 ...................................................................................................23

Fed. R. Civ. P. 56 ........................................................................................................2, 8

## INTRODUCTION

More than 75 years ago, Congress acted to protect interstate commerce by creating the Federal Mediation and Conciliation Service ("FMCS") and requiring it to offer mediation services to unions and employers whenever in the judgment of FMCS a labor "dispute threatens to cause a substantial interruption of commerce." 29 U.S.C. § 173(b). Congress expanded that mandate in 1974 by requiring FMCS to offer mediation services for *all* labor disputes in the healthcare industry. *Id.* § 158(d)(C). Since then, Congress has given FMCS additional duties.

On March 14, 2025, President Trump signed an Executive Order directing that FMCS's services be reduced to their statutory minimum. In a matter of days, FMCS adopted a new policy reducing its services to well *below* that statutory minimum, and consequently fired most of its staff, effectively disabling itself from providing the services that Congress has mandated and consistently funded.

The administrative record produced by Defendants in this case reveals that the decision to slash FMCS's services was not the result of a reasoned decisionmaking process, but rather a rushed implementation of a directive from the so-called Department of Government Efficiency ("DOGE"). The administrative record contains *no* explanation, much less a reasoned one, for why FMCS abruptly reversed longstanding agency policy to cut its services to well below statutory minimums and terminated the overwhelming majority of its staff.

Defendants' action violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, the separation of powers doctrine, and is *ultra vires*. By essentially shuttering a legislatively created agency, Defendants have usurped Congress's Article I powers and claimed them as Article II power for the Executive Branch. But under Article III, this Court is empowered to intervene.

Plaintiffs are labor unions in New York and across the country that abruptly lost the services of FMCS mediators because of Defendants' action to implement the President's Executive Order. They request that this Court grant their motion for summary judgment, set aside Defendants' unlawful action, enjoin Defendants from implementing their unreasoned policy change, and require FMCS to restore the *status quo ante*.

## BACKGROUND[1]

### A.    FMCS's Functions

In the Labor Management Relations Act of 1947 ("Taft-Hartley"), Congress established FMCS and gave it a job to do: "It shall be the duty of [FMCS], in order to prevent or minimize interruptions of the free flow of commerce growing out of labor disputes, to assist parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." 29 U.S.C. §§ 172(a), 173(a). Congress authorized FMCS to "proffer its services in any labor dispute in any industry affecting commerce . . . whenever in its judgment such dispute threatens to cause a substantial interruption of commerce." *Id.* § 173(b).

Since then, Congress has repeatedly expanded FMCS's mission. Various statutes, described in detail below, *see infra* p. 19, require FMCS to, among other things: mediate disputes in the healthcare industry; establish joint labor-management committees; appoint arbitration panels and arbitrators to resolve disputes arising under collective bargaining agreements ("CBAs"); conduct conflict resolution training for employers and employees; and assist with negotiation impasses in the federal sector.

---

[1] Local Civil Rule 56.1, which ordinarily requires a statement of undisputed material facts to accompany a motion for summary judgment under Fed. R. Civ. P. 56, "does not apply to claims brought under the Administrative Procedure Act." Plaintiffs therefore cite to the undisputed facts contained in the administrative record ("AR") submitted by the government (ECF No. 63).

B.     **FMCS's Recent Staffing and Funding**

FMCS is a small agency. In January 2025 it had 208 full-time employees, including 123 mediators. AR, at FMCS_00058. Even with that lean staff, in 2024, FMCS mediated 2,318 collective-bargaining negotiation sessions, 1,362 high-impact grievances, and 792 alternative-dispute resolution cases; conducted 1,477 training and intervention panels; provided 10,004 arbitration panels; and appointed 4,350 arbitrators.[2] FMCS estimates that it saves the American economy "over $500 million annually." AR, at FMCS_00025.

FMCS's budget is also small, representing only 0.0014% of the federal budget. *Id.* In recent years, Congress has annually appropriated approximately $54 million for FMCS. That amount was appropriated again on March 15, 2025, for the current year. *See* Pub. L. No. 119-4, div. A, § 1101(a)(8), 139 Stat. 9, 10–11 (2025). That appropriation followed FMCS's detailed budget request to support its services at historical levels, "[g]iven the anticipated size and number of collective bargaining agreements expiring in 2025."[3]

C.     **DOGE's Descent on FMCS**

On February 11, 2025, President Trump issued Executive Order No. 14210, entitled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." In response, FMCS developed an agency reduction in force ("RIF") and restructuring plan, and submitted it to the Office of Management and Budget ("OMB") and Office of Personnel Management ("OPM") on March 13, 2025. *See* AR, at FMCS_00001–15.

---

[2] FMCS, *Role & Function of the Federal Mediation & Conciliation Service* (Jan. 14, 2025), https://www.fmcs.gov/wp-content/uploads/2025/03/Role-Function-of-the-FMCS-FY24-Update-Jan-14-2025.pdf.

[3] FMCS, *Congressional Budget Submission 2025*, at 13 (Mar. 2024), https://www.fmcs.gov/wp-content/uploads/2024/03/2025-Congressional-Budget.pdf.

The next day, on March 14, 2025, President Trump issued another Executive Order—No. 14238, entitled "Continuing the Reduction of the Federal Bureaucracy"—which specifically targeted FMCS and six other agencies. The Executive Order directed that "the non-statutory components and functions [of FMCS] . . . shall be eliminated to the maximum extent consistent with applicable law," and that "such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." Exec. Order No. 14238 § 2(a)(i). The Executive Order directed FMCS to comply within one week by "explaining which components or functions . . . , if any, are statutorily required and to what extent." *Id.* § 2(b). The Executive Order further directed OMB Director Russell Vought to "reject funding requests for [FMCS] to the extent they are inconsistent with this order." *Id.* § 2(c).

FMCS responded by describing its statutorily required components and functions and the average annual workload that was required for each. AR, at FMCS_00045–59. It concluded that it would need a minimum of 86 full-time mediators, six full-time field operations support employees, and 27.5 full-time headquarters employees to fulfill its statutory mandates. *See* AR, at FMCS_00046–48, 58–59.

A few days later, DOGE descended on FMCS. *See* AR, at FMCS_00016; FMCS_00023–24; FMCS_00060–61; FMCS_00166–167. Acting FMCS Director Defendant Gregory Goldstein met with DOGE representatives on March 24, 2025 "to discuss the future of [FMCS] under current Administration guidance." AR, at FMCS_00166. Acting Director Goldstein memorialized that meeting in a two-page memorandum, the substance of which has been completely redacted by the government. But "the meeting concluded with a revised staffing plan of 15 total personnel, consisting of: 1 Director, 4 General Counsel Staff, 3 Headquarters Staff, 6

Mediators, and 1 Arbitration Program Staff Member." AR, at FMCS_00167. DOGE also

directed FMCS to close all nine of its field offices, leaving only the Washington, D.C.

headquarters open. *See* AR, at FMCS_00256–257. As Acting Director Goldstein wrote in a

memorandum to his files, "DOGE has formally communicated the Administration's expectations

for FMCS staffing levels" and FMCS would "immediately begin the planning and execution" of

"the Administration's directive and staffing model." AR, at FMCS_00167.

　　　　FMCS then rushed to do so. On March 26, FMCS placed nearly all of its mediators and

staff on administrative leave. AR, at FMCS_00252. The same day, FMCS sought from OPM a

waiver of the legally required 60-day notice period for a RIF, stating it was necessary "[i]n order

to implement" President Trump's Executive Order. AR, at FMCS_00241–243. Two days later,

on March 28, FMCS Human Resources Director Adrienne Adger informed DOGE team

representative, Ethan Shaotran, that FMCS would "need to submit additional information to

OPM as the Executive Order is not sufficient to show urgency" to justify deviating from the

normal RIF notice period. AR, at FMCS_00278. Mr. Shaotran immediately emailed OPM that

FMCS would "provide updated legal justification to underscore the urgency here." AR, at

FMCS_00277. Minutes later, Ms. Adger provided the promised "updated legal justification":

> FMCS is impacted by lack of work due to significant curtailment of duties. The
> administration's interpretation of substantial impact to interstate commerce under
> Taft Hartley is when the dispute involves a bargaining unit of 1000 employees or
> other metrics or instances as the administration may determine and communicate
> to FMCS. This statutory guidance means that FMCS must immediately suspend
> activities and proceed with notifying and releasing impacted employees.

AR, at FMCS_00276.

　　　　OPM then granted a waiver of the 60-day RIF notice requirement, explaining that "[t]his

is exactly the info we need to substantiate the waiver—it isn't push back. It is making sure the

case file has the information we need if scrutinized by external parties." AR, at FMCS_00274–75.

Beginning on March 31, FMCS notified affected employees of the mass RIF effective May 10. *See* AR, FMCS_00289–300. The RIF notices incorporated the "updated legal justification" exactly and contained the entirety of FMCS's reasoning for shuttering its services:

> This RIF is necessary to implement President Donald Trump's Executive Order (s) 14210, dated February 11, 2025, and Executive Order 14238 of March 14, 2025. FMCS is impacted by lack of work due to significant curtailment of duties. The administration's interpretation of substantial impact to interstate commerce under Taft Hartley is when the dispute involves a bargaining unit of 1000 employees or other metrics or instances as the administration may determine and communicate to FMCS.

*See, e.g.*, AR, at FMCS_00289; *see also* FMCS_00276.

Shortly thereafter, FMCS's General Counsel announced a refinement to the agency policy for healthcare disputes: "FMCS will continue to be involved with healthcare strikes when the [bargaining unit size] is 250 or more or as the administration may direct and communicate to FMCS." AR, at FMCS_00317. No reasoning accompanied this announcement.

In sum, FMCS limited its available services solely to mediation of certain private-sector and healthcare disputes above specified numerical thresholds (and in the healthcare area, it appears that services are limited to "healthcare strikes," AR, at FMCS_00317). As an explicit result of this new policy, FMCS immediately reduced the mediator workforce to less than 5% of what it had been just weeks before, citing lack of work.

To put this policy change into historical perspective, FMCS annually receives approximately 16,000 statutorily required notices (called F-7 notices) of expiring CBAs that may require the agency's assistance, 300 statutorily required notices of healthcare units' intent to strike—which require the agency's immediate intervention—and 10,000 requests for arbitration panels. AR, at FMCS_00046–48. These thousands of requests have resulted in an annual average

of 462 active mediations involving bargaining units of 100 or more employees and 1,900 active

mediations involving healthcare bargaining units. AR, at FMCS_00046–47. FMCS also has

historically provided its services each year to 200 cases in the federal sector, 900 cases for the

U.S. Postal Service, and 2,700 engagements in labor-management committees across the

country. AR, at FMCS_00047–48.

###    D.    Plaintiffs' Loss of FMCS Services

Seven Plaintiffs were actively using the services of FMCS mediators in collective

bargaining negotiations until March 26, when the mediators abruptly canceled their services

because Defendants had placed them on administrative leave. Trager Decl. ¶¶ 10, 18; Walters

Decl. ¶ 15; Gulley Decl. ¶¶ 7, 10, 14; Dashefsky Decl. ¶¶ 7–8; Hemming Decl. ¶ 8; Thornton

Decl. ¶¶ 10, 12; Pitman Decl. ¶¶ 4, 6; *see also* DiMauro Decl. ¶¶ 8–9.[4] Another Plaintiff had

three FMCS mediators scheduled to attend negotiations beginning May 5, 2025, who could not

provide cost-free services after their termination. Guzynski Decl. ¶¶ 4, 7; Guzynski Suppl. Decl.

¶¶ 2–3. These labor disputes cumulatively affect tens of thousands of employees in healthcare

bargaining units, plus tens of thousands more in other industries. *See, e.g.*, Guzynski Decl. ¶¶ 2–

4; Dashefsky Decl. ¶ 3; Walters Decl. ¶ 6. And these Plaintiffs' loss of mediation services is not

unique; such losses are widespread among Plaintiff AFL-CIO's affiliate unions. Sharma Decl.

¶¶ 4–6. While mediation is the core of FMCS's services, the termination of substantially all of

the agency's staff has also left several Plaintiffs who are contractually required to rely on

FMCS's other services with nowhere to turn. *See infra* pp. 12–13. Multiple Plaintiffs are left

---

[4] Plaintiffs include evidence from proposed Plaintiff Ohio Education Association ("OEA")
(DiMauro Decl.) because they have moved without opposition for leave to file a Second
Amended Complaint, which would include OEA as a Plaintiff, in addition to its national affiliate,
the National Education Association ("NEA").

with expired CBAs, stalled negotiations, the threat that employees will strike or employers will lock them out, or straining their budgets to pay for private services.

The value of FMCS mediators in collective bargaining cannot be overstated. FMCS mediators specialize in the resolution of labor disputes. They are experienced and highly skilled in helping employers and unions find mutually acceptable solutions to contentious issues in their workplaces—not just wages, but also pensions, benefits, and work rules involving critical matters like promotions and employee safety. In healthcare workplaces, the safety of patients is also at stake. In contrast to mediation among litigating parties, labor negotiators cannot simply leave their dispute for a judge or jury to resolve; "the parties must preserve their relationship as much as possible since they have no choice but to coexist as long as the union has majority support." Kelleher Decl. ¶ 4. And qualified private mediators—even when available—are "very expensive." *Id.* ¶ 7. For many disputes, there is no effective alternative to an FMCS mediator.[5]

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). In "a challenge to agency action under the APA, [the Court] review[s] the administrative record," and "[i]f the agency's final action does not accord with the statute as [the Court] interpret[s] it, the APA requires that the action be 'set aside.'" *Bd. of Trs. of Bakery Drivers Loc. 550 & Indus. Pension Fund v. Pension Benefit Guar. Corp.*, 136 F.4th 26, 29 (2d Cir. 2025) (quoting 5 U.S.C. § 706(2)(A)).

---

[5] Some FMCS mediators have been rehired pursuant to a preliminary injunction entered in *Rhode Island v. Trump,* Case No. 25-cv-00128-JJM-AEM (D.R.I.). It is currently unclear, however, whether and to what extent mediation services are being resumed, and in any event, the government has appealed from the preliminary injunction.

**ARGUMENT**

By adopting a policy that dramatically narrows FMCS's work to mediating only a very limited set of disputes, without any reasoning whatsoever, Defendants have both violated the APA and disabled a Congressionally created agency from fulfilling its mandates. As numerous courts have recognized with respect to the dismantling of agencies across the federal government—and of FMCS itself—these unreasoned changes are arbitrary and capricious, as well as contrary to law, in violation of the APA.[6] Moreover, the Executive Branch's effective destruction of a Congressionally created agency is *ultra vires* and violates the separation of powers doctrine. As explained in detail below, the proper remedy in this case is to set aside Defendants' action, enjoin Defendants from implementing their unreasoned policy change, and require FMCS to restore the *status quo ante*.

## I.    Plaintiffs Have Article III Standing.

"To establish standing," a plaintiff must "demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). The "injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Id.* at 381.

---

[6] *See, e.g.*, *Rhode Island v. Trump*, 2025 WL 1303868 (D.R.I. May 6, 2025) (FMCS and other agencies affected by Executive Order 14238); *Widakuswara v. Lake*, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) (U.S. Agency for Global Media); *Nat'l Treasury Emps. Union v. Vought*, 2025 WL 942772 (D.D.C. Mar. 28, 2025) (Consumer Financial Protection Bureau); *New York v. McMahon*, 2025 WL 1463009 (D. Mass. May 22, 2025) (Department of Education); *cf. Am. Fed'n of Gov't Emps. v. Trump*, --- F.4th ---, 2025 WL 1541714, at *2 (9th Cir. May 30, 2025) (numerous federal agencies affected by mass RIFs). These decisions are at various stages of appeal.

"A Union can assert standing on behalf of itself as an institution or on behalf of its members." *Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 853 (D.C. Cir. 2006) (citing *UFCW Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553, (1996)). Plaintiffs here have both kinds of standing.

## A.     Plaintiffs' Institutional Injury.

Plaintiffs have standing because they were engaged in bargaining with help from FMCS, but as a direct result of Defendants' action, they lost FMCS's services, making bargaining more difficult, more delayed, more costly, and less successful.

Plaintiffs UFT, IAM District 160, UFCW Local 135, UFCW Local 2013, and AFSCME Council 31 were all in collective bargaining negotiations for expired contracts in March 2025. All were using the services of an FMCS mediator to work through disputes that were irreconcilable without the mediator's assistance. Trager Decl. ¶¶ 5–9, 13–17; Hemming Decl. ¶ 7; Walters Decl. ¶¶ 10–13; Thornton Decl. ¶¶ 10, 12; Pitman Decl. ¶¶ 4–6; *see also* DiMauro Decl. ¶¶ 8–9. Because nearly all FMCS mediators were placed on immediate administrative leave on March 26, 2025, the mediators working with these Plaintiffs were forced to cancel their scheduled mediations. These Plaintiffs' negotiations immediately stalled. Trager Decl. ¶¶ 10–12, 18–19; Hemming Decl. ¶ 9; Walters Decl. ¶¶ 15–16; Thornton Decl. ¶ 12; Pitman Decl. ¶ 6; Pitman Suppl. Decl. ¶¶ 3–7.

As Plaintiffs have attested, the loss of FMCS mediators made the interrupted bargaining far more difficult, delaying negotiations and hindering the unions' ability to secure good contracts for their members. Some union staff have had to spend time on completely unproductive negotiation sessions. Walters Decl. ¶¶ 14–15; Pitman Decl. ¶ 6. Some negotiations are not progressing at all. Hemming Decl. ¶¶ 8–9; Trager Decl. ¶ 12; Thornton Decl. ¶ 12. Some unions have concluded they can only move forward by paying expensive private mediators.

Walters Suppl. Decl. ¶ 3; Trager Suppl. Decl. ¶ 5; Guzynski Suppl. Decl. ¶ 3; *see also* DiMauro

Decl. ¶ 12. Many union members are working under expired contracts, or without contracts. *See,*

*e.g.*, Trager Suppl. Decl. ¶¶ 3, 6; Gulley Decl. ¶¶ 13–15; Dashefsky Decl. ¶¶ 8–9; Walters Decl.

¶¶ 5, 12, 14–16; Thornton Decl. ¶ 12; Pitman Decl. ¶ 6. Some units are making concrete plans to

go on strike. Pitman Supp. Decl. ¶ 7. Nor is there any indication that these harms will end soon.

To take just one example, Plaintiff CIR SEIU has numerous rounds of collective bargaining

coming up for healthcare workers that would unquestionably have involved FMCS mediators,

and which will be substantially more difficult to conclude successfully without the assistance of

an FMCS mediator. Dashefsky Decl. ¶¶ 8–9, 12–13.

 This "fundamentally diminished" bargaining process creates a concrete, non-speculative

injury to the unions and their members. *Chertoff*, 452 F.3d at 853–54. "[T]he change wrought on

the bargaining process itself . . . causes immediate injury to the Unions." *Id.* at 854. "[A] denial

of a benefit in the bargaining process can itself create an Article III injury, irrespective of the end

result." *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998) (citing *Ne. Fla. Chapter,*

*Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993), where contractors

suffered an "injury in fact" based on a "harm . . . in the negotiation process" for city contracts). It

is for that precise reason the Second Circuit has recognized that unions are harmed whenever the

collective bargaining process is impaired or delayed. "[D]elay is ultimately corrosive to the

collective bargaining process itself," *Emhart Indus., Hartford Div. v. NLRB*, 907 F.2d 372, 379

(2d Cir. 1990), because it "impair[s] the union's ability to function effectively . . . giving the

impression to members that a union is powerless." *NLRB v. WPIX, Inc.*, 906 F.2d 898, 901 (2d

Cir. 1990).

More generally, the Supreme Court has held that if a challenged practice has "perceptibly impaired [an organization's] ability to provide [its] services . . . there can be no question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982). The Second Circuit so concluded in *New York v. U.S. Department of Homeland Security*, 969 F.3d 42, 61 (2d Cir. 2020), where nonprofit organizations were among plaintiffs challenging an agency rule regarding provision of public services to immigrants. The Court held that the agency action "impede[d] the Organizations' abilities to carry out their responsibilities in a variety of ways," requiring them to change their constituent services and divert resources they could have used elsewhere. *Id.* Here, the declarations detailing broken-down bargaining leave no doubt that Plaintiffs' primary mission—bargaining good contracts for their members—has been perceptibly impaired, as Plaintiffs now must engage in unproductive bargaining, "scramble[] to figure out how to proceed" without FMCS mediators, hire expensive private mediators, and work to appease dissatisfied members who felt that progress was being made with FMCS's help. Hemming Decl. ¶ 9; *accord* Trager Suppl. Decl. ¶¶ 3, 6; Pitman Suppl. Decl. ¶¶ 8–9; DiMauro Decl. ¶¶ 9, 11–12; *see also supra* pp. 10–11.

FMCS's failure to perform non-mediation functions likewise harms Plaintiffs. For instance, it appears that FMCS no longer assists unions and employers in setting up labor-management committees—a type of collaboration defined under federal labor law that allows unions and employers to work together in creative ways, *see infra* p. 19—to the detriment of both unions and employers. DiMaria Decl. ¶¶ 5–9; DiMaria Suppl. Decl. ¶¶ 5–6. In addition, multiple Plaintiffs have current CBAs that require the parties to use FMCS mediators or arbitrators at various points in their process for resolving disputes that arise under the contract; in some of those contracts, the employer party to this contract provision is the federal government

itself. *E.g.*, Shepherd Decl. ¶¶ 5–7; Glymph Decl. ¶¶ 3, 5–6; Dahn Decl. ¶¶ 5–6, 8–9; *see also*

DiMauro Decl. ¶¶ 7, 10. Some employers in such CBAs refuse to waive the required

involvement of FMCS, thereby stalling the dispute-resolution process, Shepherd Decl. ¶ 8, but if

a union asked to reopen the contract to renegotiate that requirement, it would jeopardize the

entire contract. DiMauro Decl. ¶ 7. Without FMCS's services, these Plaintiffs will be unable to

enforce their contracts, thereby diminishing the services they can provide their members and

"weaken[ing] support for the union." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th

Cir. 2011) (a "diminished level of support" is an irreparable harm to the union if members

believe "the benefits of unionization are lost").

### B.    Plaintiffs' Associational Injury on Behalf of Their Members.

Plaintiffs likewise assert an associational injury on behalf of their members because "(a)

[their] members would otherwise have standing to sue in their own right; (b) the interests

[Plaintiffs] seek[] to protect are germane to the organization's purpose; and (c) neither the claim

asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (quotations omitted).

Plaintiffs' members plainly would have standing. "Employees join unions in order to

secure collective bargaining." *Karp Metal Prods. Co.,* 51 NLRB 621, 624 (1943). Multiple

Plaintiffs' members are working under expired contracts (or negotiating for a first contract), and

agreements are unlikely in the near future without the assistance of an FMCS mediator or resort

to economic weapons. *Supra* pp. 10–11. Every day that Plaintiffs' members work without the

protection of a current CBA, they "are denied the opportunity to achieve the economic benefits

that a CBA can secure for workers." *Small*, 661 F.3d at 1191.

As for the second and third factors, Plaintiffs exist to represent their members. Bringing

this lawsuit to restore the services of FMCS mediators to help Plaintiffs resolve labor disputes on

behalf of their members is germane to member representation. And the relief Plaintiffs seek does not depend on the participation of individual members. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287–88 (1986). Similarly, the AFL-CIO's standing is confirmed by its affiliate unions, for the same reasons. Sharma Decl. ¶¶ 4–6.

C.      **Causation and Redressability.**

Defendants' action to slash FMCS's services has plainly caused Plaintiffs' injuries, which would be directly redressed by the requested remedy to require the agency to restore the *status quo ante* and resume all services that were being provided before March 26. Compl., Prayer for Relief. Plaintiffs therefore have Article III standing to bring their claims.

II.      **Defendants' Action Violates the APA.**

The APA authorizes courts to review final agency action, and to hold unlawful and set aside those actions which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional . . . power," or "in excess of statutory . . . authority." 5 U.S.C. §§ 704, 706(2)(A)–(C). It also empowers reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). All of these provisions require action here.

A.      **Slashing FMCS's Services Is a Final Agency Action.**

Defendants' decision to limit FMCS's services to *only* mediating "healthcare strikes" in bargaining units above 250 members and other disputes in private-sector units above 1,000 members constitutes final agency action, subject to judicial review under the APA. This action "'mark[s] the consummation of the agency's decisionmaking process,' and is 'one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997)).

14

*First*, the administrative record confirms that the adoption of the new policy marks the consummation of the decisionmaking process. FMCS told OPM that, as a consequence of the new policy, "FMCS must immediately suspend activities and proceed with notifying and releasing impacted employees." AR, at FMCS_00276. And it did so: as of March 26, 2025, FMCS ceased providing the services that it had been actively providing and laid off nearly all of its employees, specifically citing lack of work under the new policy. *Supra* pp. 5–6. In *Biden v. Texas*, 597 U.S. 785, 807 (2022), the Supreme Court held that an "attempt[] to terminate" an agency's programming constitutes "final agency action." Defendants have done more than *attempt* to terminate most of FMCS's services; they have already done so. *Rhode Island*, 2025 WL 1303868, at *9.

*Second*, legal consequences have already flowed from Defendants' action. The "core question" in any case challenging agency action "is whether the result of the agency's decisionmaking process is one that will directly affect the parties." *NLRB v. Nexstar Media Inc.*, 133 F.4th 201, 204 (2d Cir. 2025). It has already done so here, derailing many negotiations in process in late March. *Supra* pp. 10–11. Accordingly, "FMCS [has] taken final agency actions subject to the Court's review." *Rhode Island*, 2025 WL 1303868, at *9; *see also Widakuswara*, 2025 WL 945869, at *4.

**B.    FMCS's Action Violates Section 706(2) of the APA.**

**i.    *Defendants' Action To Slash FMCS's Services Is Arbitrary and Capricious.***

The APA "requires agencies to engage in 'reasoned decisionmaking,' and directs that agency actions be 'set aside' if they are 'arbitrary' or 'capricious.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16–17 (2020) (first quoting *Michigan* v. *EPA*, 576 U.S. 743, 750 (2015); then quoting 5 U.S.C. § 706(2)(A)). This requirement is not some box-checking exercise that an agency may ignore. "The reasoned explanation requirement of administrative

law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). And when conducting such review, "a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Id.* at 780. In other words, a court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

Here, the agency gave *no* reasoning—zero—for the new policy of performing no services other than mediating striking healthcare units above 250 members and other bargaining units above 1,000 members. The administrative record reveals that the decision to reduce FMCS's workforce to six mediators (which FMCS has described as a consequence of the numerical threshold policy) was made in a single meeting on March 24, 2025 between Acting Director Goldstein and DOGE representatives, *supra* pp. 4–5, but since the substance of the memorandum describing that meeting is entirely redacted, the government of course cannot rely on any reasons discussed at that meeting, *Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 312 (S.D.N.Y. 2012) ("[I]t is the agency's articulated justification for its decision that is at issue; the private motives of agency officials are immaterial."). The agency likewise provided no explanation for its apparent determination that *six* mediators could provide all statutorily required services, after FMCS leadership had concluded days earlier that more than 80 mediators and additional support staff would be needed to fulfill the agency's statutory requirements. *See supra* p. 4. In fact, as far as the administrative record reveals, the DOGE team (or the agency in conjunction with the DOGE team) did not even perform any analysis of what services were statutorily required.

The lack of reasoning, standing alone, requires reversal of the agency's action. "There are no findings and no analysis" in FMCS's explanation for adopting a numerical-threshold policy (and consequently firing 95% of its mediation staff), let alone "any rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). To satisfy basic APA review, any "reasoned explanation" must reflect "consideration of the relevant factors," including "the advantages *and* the disadvantages of agency decisions." *Michigan*, 576 U.S. at 753. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quotations omitted). Here, the administrative record plainly shows that the agency's decision is based on no facts, no data, no legal analysis, and no reasoned conclusions.

Indeed, the chronology here shows that DOGE's priority was to fire people as quickly as possible; only later did they come up with a reason. Although the RIF notices describe the RIFs as a consequence of the 1,000-member threshold, that 1,000-member threshold appears in the administrative record for the first time only *after* DOGE had directed FMCS to eliminate nearly all of its mediator staff, and only in response to OPM's requirement for "updated legal justification" in order to provide a waiver of the normal RIF notice period. *Supra* pp. 4–6. Even then, there is no explanation for how or why the 1,000-member threshold was chosen, much less an explanation for how the subsequently adopted 250-member healthcare strikes threshold was chosen. Even if there were such an explanation, contrived, post hoc reasoning does not satisfy APA review. *Dep't of Com.*, 588 U.S. at 783–85 (when "the explanation for agency action" was

17

"incongruent with what the record reveals about the agency's priorities and decisionmaking process," the action did not pass muster under the APA).

On top of this, FMCS's action is arbitrary and capricious for another independent reason: such a dramatic "change[ in] course" in providing agency services must account for the fact that the agency's "longstanding" services "may have engendered serious reliance interests." *Regents of Univ. of Cal.*, 591 U.S. at 30 (quotations omitted). It is "arbitrary and capricious to ignore such matters." *Id.* (quotations omitted); *accord Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. ---, 145 S. Ct. 898, 917 (2025) (explaining "change-in-position doctrine," which holds that "agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests" (cleaned up)).

The administration's interpretation did not even acknowledge that it was pulling the rug out from under employers and unions across the country who have long relied on the services of FMCS mediators, many of whom were literally scheduled to meet with FMCS mediators on March 26. It did not consider the interests of parties like Plaintiffs who rely on FMCS mediators to avoid strikes or lockouts that can disrupt commerce. Nor did the new interpretation consider the effect on parties whose existing CBAs *require* the use of FMCS services in their dispute resolution process.

The foregoing is more than enough to require reversal of the agency's action and remand to the agency, which has abandoned its basic duty to engage in reasoned agency decisionmaking. Beyond all of this, however, Defendants' action to slash FMCS's services is arbitrary and capricious because it cannot be reconciled with the statutes governing FMCS. Plaintiffs turn now to those statutes.

### ii.    *Defendants' Action Is Contrary to Law.*

Congress has enacted multiple statutes giving FMCS a duty to provide or make available its services:

- The Taft-Hartley Act: "[i]t shall be the *duty* of [FMCS] . . . to assist parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation," 29 U.S.C. § 173(a) (emphasis added); *see also supra* p. 2;

- The Health Care Amendments of 1974: "[w]henever the collective bargaining involves employees of a health care institution," and "notice [of a labor dispute] is given to [FMCS] . . . the Service *shall* promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement," 29 U.S.C. § 158(d)(C) (emphasis added);

- The Labor Management Cooperation Act of 1978: FMCS "is *directed* to provide assistance" to employers and labor organizations in establishing and operating "plant, area and industrywide labor management committees," *id.* § 175a(a)(1) (emphasis added);

- The Civil Service Reform Act of 1978: FMCS "*shall* provide services and assistances" to federal agencies and unions representing federal employees "in the resolution of negotiation impasses," 5 U.S.C. § 7119(a)–(b) (emphasis added).

These statutes describe unequivocal mandates. By using mandatory words like "duty," "direct," and "shall," the statutes have "imposed an obligation" on FMCS. *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020). FMCS's new policy limiting the

services it will perform is contrary to law because it flouts these statutory requirements in at least four ways.

*First,* the healthcare strikes threshold of 250 or more bargaining-unit employees flies in the face of Congress's statutory command that "[w]henever the collective bargaining involves employees of a health care institution," and "notice [of a labor dispute] is given to [FMCS] . . . the Service *shall* promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement." 29 U.S.C. § 158(d)(C) (emphasis added). That statutory command does not permit a numerical threshold for bargaining unit size, or a requirement that a strike be imminent, before FMCS may provide its services in the healthcare industry.

*Second,* there is no reasonable interpretation of the statute that would permit a categorical size-based limit on FMCS's services in non-healthcare workplaces. The law requires *all* unions in industries affecting interstate commerce—regardless of bargaining-unit size—to notify FMCS of labor disputes and pending strikes, so that FMCS can decide on a case-by-case basis whether to provide its services. *Id.* §§ 158(d), (g). Congress thus intended to guard against the risk that labor disputes in even small bargaining units could cause a substantial interruption of interstate commerce. One obvious source of that risk flows from the fact that multiple bargaining units— which may have fewer than 1,000 or 250 employees individually but have thousands in the aggregate—can be covered by one or more CBAs negotiated in multi-unit or coalitional bargaining. Plaintiffs' evidence describes examples of such coalitional bargaining, including the Albertson's grocery store employees represented by multiple UFCW locals, Walters Decl. ¶¶ 6– 7, and the healthcare workers at Kaiser Permanente represented by Plaintiff UNAC/UHCP,

Guzynski Decl. ¶¶ 3–4. FMCS's new policy completely ignores this common situation, without any explanation whatsoever.

Third, the administrative record establishes that the categorical thresholds were imposed by the directive of "the administration" and based on "the administration's interpretation" of Taft-Hartley. It also says that "the administration may determine and communicate to FMCS" additional criteria for providing services. Supra pp. 5–6. It leaves no room for FMCS to apply its interpretation of the statutes or its judgment. Under Taft-Hartley, however, it is the judgment of FMCS, not the directives of "the administration," that must support any limit on FMCS's services based on a lack of substantial impact on interstate commerce. 29 U.S.C. § 173(b).

Fourth, as explained by two longtime FMCS employees, there is simply no way that the six remaining mediators could mediate even the disputes of striking healthcare bargaining units over 250 employees or other private-sector bargaining units of over 1,000 employees. Ramirez Decl. ¶¶ 24–27; Kelleher Decl. ¶¶ 8–9. Such large disputes are exceptionally complicated and require intensive preparation on the part of the mediator. The administrative record shows absolutely no analysis supporting the decision that six mediators alone could implement the new policy—much less fulfill all of FMCS's other required functions. As Judge Oetken recognized in granting a temporary restraining order of the dismantling of the U.S. Agency for Global Media ("USAGM"), an agency violates the mandates of its "governing statute" when it so drastically reduces its functions as to become a shell of its former self. Widakuswara, 2025 WL 945869, at *8 (remaining staff of 64 employees was "hardly sufficient" for USAGM to "carry out all of [its]

statutory mandates").[7] Here, "nothing suggests that FMCS' remaining employees can continue to perform its statutory duties." *Rhode Island*, 2025 WL 1303868, at *13.

Beyond being contrary to the laws establishing FMCS's duties, Defendants' actions are in conflict with Congress's appropriations for FMCS. For the current fiscal year, Congress has appropriated almost $54 million for FMCS "to carry out the functions vested in it by the Labor-Management Relations Act, 1947 . . . ; the Labor-Management Cooperation Act of 1978; and . . . the Civil Service Reform Act." Pub. L. No. 118-47, 138 Stat. 460, 697 (2024); Pub. L. No. 119-4, div. A, § 1101(a)(8), 139 Stat. 9, 10–11 (2025) (most recent continuing resolution). Through these enactments, "Congress made clear that it wanted to appropriate funds to . . . FMCS so [it] may operate at the same level as the previous fiscal year." *Rhode Island*, 2025 WL 1303868, at *14. Although "a President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program," the "President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). "Absent Congressional authorization," Defendants "may not redistribute or withhold properly appropriated funds in order to effectuate [their] own policy goals." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).

But that is exactly what Defendants have done here. "FMCS took actions that essentially directed the rescission of funds to fulfill the President's policy—with congressional authorization glaringly absent." *Rhode Island*, 2025 WL 1303868, at *14.

---

[7] After Judge Oetken entered a temporary restraining order in *Widakuswara*, the case was transferred to the U.S. District Court for the District of Columbia, which entered a preliminary injunction on essentially the same grounds that Judge Oetken had articulated. *Widakuswara v. Lake*, No. 1:25-CV-1015, 2025 WL 1166400, at *18 (D.D.C. Apr. 22, 2025). The government has appealed, and the D.C. Circuit Court of Appeals partially stayed the injunction pending appeal. *See* ECF No. 47. The basis for that partial stay is not applicable here, for reasons Plaintiffs have explained in connection with their prior motion for preliminary injunction. *Id.*

By flouting both FMCS's "statutory mandates and congressional appropriations acts," *id.*, Defendants' action is "not in accordance with law" and violates § 706(2)(A) of the APA.

### iii.     Defendants' Action Is In Excess of Statutory Authority and Contrary to Constitutional Power.

For much the same reasons, Defendants' action with respect to FMCS is "in excess of . . . statutory authority," and "contrary to constitutional . . . power." 5 U.S.C. § 706(2)(B)–(C).

*First*, Congress has given FMCS no authority to eliminate its statutorily-mandated and Congressionally-funded services. If Congress cannot delegate far more modest grants of regulatory authority through "modest words," "vague terms," or "subtle devices," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022), then Defendants surely lack any constitutional or statutory authority to cease their statutorily-mandated and Congressionally-funded functions, or hollow out FMCS so dramatically that it lacks the capacity to execute them, without any direction from Congress at all.

*Second*, Defendants' action violates the Take Care Clause of the Constitution. Article II provides that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. It is a "settled, bedrock principle[] of constitutional law" that "the President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *Aiken Cnty.*, 725 F.3d at 259 (Kavanaugh, J.). Indeed, "it has been the case for centuries that neither the President, nor his executive branch, may unilaterally refuse to carry out a congressional command." *Widakuswara*, 2025 WL 945869, at *6 (citing *Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 525 (1838) ("To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution; is a novel construction of the constitution, and entirely inadmissible.")). "The executive's job . . . is limited to 'tak[ing] Care' that such statutes be 'faithfully executed.'" *Id.* at *7 (quoting U.S. Const. art. II, § 3).

23

"Withholding congressionally appropriated funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on this constitutional mandate." *Id.*; *accord Rhode Island*, 2025 WL 1303868, at *15.

*Third*, and relatedly, Defendants' action to effectively destroy FMCS violates the separation of powers. The cessation of nearly all statutory functions necessarily implies the withholding of statutorily appropriated funds to perform those functions. *See Rhode Island*, 2025 WL 1303868, at *14. And that is precisely what the President has ordered. Executive Order 14238 directs Defendant OMB and its Director, Defendant Russell Vought to "reject funding requests for [FMCS] to the extent they are inconsistent with this order." Exec. Order 14238 § 2(c). In so doing, the "executive is usurping Congress's power of the purse and its legislative supremacy." *Widakuswara*, 2025 WL 945869, at *7; *see also Rhode Island*, 2025 WL 1303868, at *14.

More fundamentally, the Constitution gives power over "the establishment of offices [and] the determination of their functions and jurisdiction" to Congress—not to the President or any officer working under him. *Myers v. United States*, 272 U.S. 52, 129 (1926). Executive agencies like FMCS "are creatures of statute," brought into existence by Congress. *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). The President and his officers may not abolish through executive fiat an agency created by statute. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton*, 524 U.S. at 438.

### C.    Defendants Have Unlawfully Withheld Agency Action from Plaintiffs, in Violation of Section 706(1) of the APA.

The APA further empowers courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take."

24

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Defendants here have unlawfully withheld agency action, violating Section 706(1) of the APA, in at least three respects.

*First*, FMCS is unlawfully withholding required services from parties in healthcare sector labor disputes by reducing the FMCS mediation staff and limiting its services to striking bargaining units of 250 or more employees, contrary to 29 U.S.C. § 158(d)(C).

*Second*, by following the administration's numerical thresholds, FMCS has unlawfully withheld services from disputes that FMCS already had determined "in *its* judgment" could substantially affect interstate commerce. *Id.* § 173(b) (emphasis added). This is obvious from the fact that FMCS withdrew services that it had previously been providing, without explaining why its judgment about those disputes had changed.

*Third,* as to both healthcare and non-healthcare bargaining units, the law requires that "[w]henever [FMCS] does proffer its services in any dispute, it shall be the duty of the Service promptly to put itself in communication with the parties and to use its best efforts, by mediation and conciliation, to bring them to agreement." *Id.* § 173(b); *see also* 29 C.F.R. § 1403.4 ("[FMCS] will assign one or more mediators to each labor-management dispute in which it has been determined that its services should [be] proffered."). In other words, where FMCS has started providing its services, it may not withdraw them until "its best efforts . . . to bring [the parties] to agreement" have been exhausted. 29 U.S.C. § 173(b). Defendants violated this statutory command by withdrawing FMCS's services without even pausing to consider the status of current negotiations.

## III. Defendants' Action to Disable FMCS from Fulfilling Its Statutory Functions Violates the Separation of Powers and Is Ultra Vires.

For the same reasons discussed in Part II.B.ii and Part II.B.iii., Defendants' action to disable FMCS from fulfilling its statutory mandates violates the separation of powers and is *ultra*

*vires*. Independent of the APA, this Court is equitably empowered to enjoin and declare unlawful official action that violates the Constitution. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *see also NTEU*, 2025 WL 942772, at *40.

Neither the President nor his subordinates have authority to dismantle a legislatively created agency, to disregard its statutory mandates, or refuse to spend its appropriated funds. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). Indeed, "the Executive must abide by statutory mandates and prohibitions," as passed by Congress—a "basic constitutional principle" that "appl[ies] to the President and subordinate executive agencies" like Defendants. *Aiken Cnty.*, 725 F.3d at 259 (Kavanaugh, J.). But Defendants' action here violates that basic constitutional principle because it has not only "result[ed] in the cessation of" statutorily mandated services, but has also "usurp[ed] Congress's: (1) power of the purse, by disregarding congressional appropriations, and (2) vested legislative authority to create and abolish federal agencies." *Rhode Island*, 2025 WL 1303868, at *15. Defendants have therefore violated the separation of powers.

Defendants' action is likewise *ultra vires* because "[n]either the Constitution nor any federal statute grants the President [or his subordinates] the authority to direct the kind of large-scale reorganization of the federal government at issue." *AFGE*, 2025 WL 1541714, at *5 (9th Cir. May 30, 2025). "The simple proposition that the President may not, without Congress, fundamentally reorganize the federal agencies is not controversial: constitutional commentators and politicians across party lines agree that sweeping reorganization of the federal bureaucracy requires the active participation of Congress." *Am. Fed'n of Gov't Emps. v. Trump*, 2025 WL 1482511, at *18 (N.D. Cal. May 22, 2025) (quotations omitted; collecting sources). Yet

"Congress has passed no statute that expressly authorizes the Executive to dissolve [FMCS] or transfer its congressionally mandated responsibilities to other agencies." *New York*, 2025 WL 1463009, at *23 (quotations omitted). Defendants have therefore acted beyond their statutory and constitutional authority. Their action is *ultra vires*.

## IV.    The Court Should Set Aside Defendants' Unlawful Action.

The APA authorizes federal courts to "set aside" unlawful agency action. 5 U.S.C. § 706(2). As Justice Kavanaugh recently explained in synthesizing fundamental principles of administrative law, "[u]nlike judicial review of statutes, in which courts enter judgments and decrees only against litigants, the APA and related statutory review provisions go further by empowering the judiciary to act directly against the challenged agency action" by "authoriz[ing] vacatur of agency rules." *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring) (quotations omitted). Indeed, "countless [Supreme Court] decisions" have "vacated the challenged agency rules rather than merely providing injunctive relief that enjoined enforcement of the rules against the specific plaintiffs." *Id.* at 830–31 (collecting cases). "And the D. C. Circuit—which handles the lion's share of the country's administrative law cases—has likewise long recognized" that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Id.* at 831 (quotations omitted).

Setting aside Defendants' policy to limit FMCS's services to only mediating a narrow slice of disputes is the proper remedy here. As Plaintiffs have shown, the policy violates the APA, the relevant statutes governing FMCS, and the Constitution. Moreover, providing meaningful relief to Plaintiffs requires setting aside the RIF, which was explicitly premised solely on the lack of work created by the new policy. Neither common sense nor the record evidence supports the idea that FMCS could provide its pre-March 26 services with only six

mediators. Ramirez Decl. ¶¶ 24–27; Kelleher Decl. ¶¶ 8–9; *see also Rhode Island*, 2025 WL 1303868, at *13 ("[N]othing suggests that FMCS'[s] remaining employees can continue to perform its statutory duties."). Accordingly, at a minimum, FMCS must offer to return all of its affected employees to work in order to actually restore the *status quo ante*.

Such a remedy does not impermissibly interfere with the executive branch's management of its personnel or its ability to re-organize the agency pursuant to the President's executive orders. It is not the judiciary's role to say what the Defendants can or must do; the agency must make that determination in the first instance, so long as it provides a non-contrived, reasoned explanation for doing so. *Dep't of Com.*, 588 U.S. at 785. But until such time as FMCS has made a reasoned decision to modify its services that is consistent with the law, the only remedy to Defendants' multiple violations of the APA, the relevant statutes, and Constitution is to vacate the policy limiting FMCS's services, and order FMCS to return to the *status quo ante*.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment.

Dated: June 13, 2025

/s/ Elisabeth Oppenheimer
Elisabeth Oppenheimer*
(*Lead Trial Counsel*)
Cole Hanzlicek*
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth St, N.W., Suite 1000
Washington, D.C. 20005
(202) 842-2600
(202) 842-1888 (fax)
eoppenheimer@bredhoff.com
chanzlicek@bredhoff.com

*Counsel for Plaintiffs*

*Admitted Pro Hac Vice*

## <u>CERTIFICATION OF WORD COUNT COMPLIANCE</u>

Case Caption: American Federation of Teachers, AFL-CIO, *et al.* v. Goldstein, *et al.*

Case No: 1:25-cv-03072-AS

      As required by Rule 7.1(c) of the Joint Local Rules, S.D.N.Y. and E.D.N.Y., I certify the document contains 8,594 words excluding the parts of the document that are excepted by the rule.

      I declare under penalty of perjury that the foregoing is true and accurate.


Dated: June 13, 2025                          */s/ Elisabeth Oppenheimer*
                                             Elisabeth Oppenheimer
                                             BREDHOFF & KAISER, P.L.L.C.