**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN FEDERATION OF TEACHERS, AFL-CIO; UNITED FEDERATION OF TEACHERS; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; SEIU HEALTHCARE MINNESOTA & IOWA; SEIU COMMITTEE OF INTERNS AND RESIDENTS; UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO; UFCW LOCAL 135; UFCW LOCAL 2013; INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO; IAM DISTRICT 160; AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO; AFSCME COUNCIL 31; UNITED NURSES ASSOCIATIONS OF CALIFORNIA/UNION OF HEALTH CARE PROFESSIONALS; NATIONAL EDUCATION ASSOCIATION; OHIO EDUCATION ASSOCIATION; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; and AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,<br><br>      PLAINTIFFS,<br><br>v.<br><br>GREGORY GOLDSTEIN, in his official capacity as Acting Director of the Federal Mediation and Conciliation Service; FEDERAL MEDIATION AND CONCILIATION SERVICE; UNITED STATES OF AMERICA; UNITED STATES OFFICE OF MANAGEMENT AND BUDGET; and RUSSELL T. VOUGHT, in his official capacity as the Director of the Office of Management and Budget,<br><br>      DEFENDANTS. | Case No.: 1:25-cv-3072<br><br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      In 1947, Congress created the Federal Mediation and Conciliation Service ("FMCS" or "Service") and charged it with "the duty . . . to prevent or minimize interruptions of the free flow of commerce growing out of labor disputes" by providing its services to "settle such disputes through conciliation and mediation." 29 U.S.C. § 173.

2.      In the years since, Congress has charged FMCS with additional responsibilities, including mandatory mediation of disputes in the healthcare industry; establishing and operating joint labor-management committees; appointing arbitration panels and arbitrators to consider labor disputes; conducting skills development and conflict resolution training for employers and employees; and providing its services to assist with negotiation impasses in the federal sector and certain labor disputes in the U.S. Postal Service. FMCS also has the authority to provide its services to facilitate negotiations that affect interstate commerce.

3.      FMCS has fulfilled its statutory responsibilities with remarkable success, assisting labor organizations representing workers and employers across the country in amicably resolving their disputes, which, in turn, has generated over $500 million in national economic savings each year, even by conservative estimates.[1] In fiscal year 2024, FMCS mediated 2,318 collective-bargaining negotiation sessions, 1,362 high-impact grievances, and 792 alternative-dispute resolution cases; conducted 1,477 single or multi-day training and intervention panels; and provided 10,004 arbitration panels and appointed 4,350 arbitrators.[2]

---

[1] FMCS, *A Strategic Investment and Vital Part of America's Economic Future* (last accessed April 9, 2025), https://www.fmcs.gov/wp-content/uploads/2025/03/FMCS-Econ-One-Pager_2025-APPROVED.pdf.
[2] FMCS, *Role & Function of the Federal Mediation & Conciliation Service* (Jan. 14, 2025) (last accessed April 5, 2025), https://www.fmcs.gov/wp-content/uploads/2025/03/Role-Function-of-the-FMCS-FY24-Update-Jan-14-2025.pdf.

4.      In 2024, FMCS fulfilled its statutory responsibilities to mediate labor disputes across the United States with the services of approximately 204 full-time employees, including approximately 143 mediators in nine District/Field offices across the country and in Washington, D.C.[3]

5.      FMCS has fulfilled its statutory responsibilities with an annual budget of approximately $54 million—0.0014% of the federal budget—an amount that Congress has consistently appropriated for fiscal years 2024 and 2025 through a series of continuing resolutions, the most recent of which was enacted on March 15, 2025.

6.      Through unchanging statutory mandates and repeated appropriations to FMCS, Congress has manifested its clear intent that FMCS continue to carry out its statutory responsibilities at current levels.

7.      Yet President Trump—in clear defiance of Congress's exclusive power to create and dissolve executive agencies, charge them with certain statutory functions and responsibilities, and appropriate funds to carry out their services—has moved to dismantle FMCS and disable it from performing the statutory responsibilities that Congress has required.

8.      On March 14, 2025, one day before Congress manifested its clear intent that FMCS continue to operate at current levels, President Trump signed an Executive Order directing FMCS to "reduce the performance of [its] statutory functions and associated personnel to the minimum presence and function required by law." Exec. Order No. 14238, "Continuing the Reduction of the Federal Bureaucracy," (Mar. 14, 2025).

9.      FMCS responded to the President's Executive Order, drafting a plan to reduce the size of its workforce to approximately 100 mediators (or 80 mediators if services were provided

---

[3] *Id.*

primarily via remote meetings). In its judgment, this was the minimum number of mediators necessary to carry out the agency's statutory responsibilities, as charged by Congress, based on FMCS's historical analysis of time spent by mediators each year performing statutorily required duties across the country.

10.     Shortly after FMCS submitted its plan to comply with President Trump's Executive Order, officials associated with the U.S. DOGE Service and the U.S. DOGE Service Temporary Organization (collectively, "DOGE") and the U.S. Office of Management and Budget ("OMB") ordered FMCS to implement far more drastic cuts to the agency's personnel and services.

11.     Instead of the 80 to 100 mediators that FMCS had determined were necessary to perform its statutory responsibilities across the country, DOGE and OMB ordered that only approximately five mediators would remain at FMCS.

12.     DOGE and OMB further directed cutting essentially the entire FMCS staff, with the exception of the Acting Director, four employees in the Office of General Counsel, and approximately four other staff. This skeleton staff and five to six mediators now bear the same statutory responsibilities which, until just a few weeks earlier, were performed by a staff approximately fifteen times larger.

13.     The remaining FMCS officials, including Acting Director Gregory Goldstein, have begun to implement DOGE and OMB's directive. Approximately 93% of FMCS's workforce—including all but five to six mediators—were placed on administrative leave beginning on March 26, 2025, and have received notices of an imminent Reduction in Force, which began going into effect on May 10, 2025.

14.      FMCS has closed all of its Field/District Offices across the United States. Only the skeleton staff are permitted to continue working, and only in FMCS's Washington, D.C. headquarters.

15.      As a result of the President's Executive Order and the subsequent actions by DOGE and OMB, FMCS cannot fulfill its statutory responsibilities as charged by Congress. The President's Executive Order—in clear defiance of Congress' recent mandate for FMCS to continue to operate at current levels—constitutes a de facto dismantling of FMCS by executive fiat and has been implemented as such.

16.      The Constitution, however, gives power over "the establishment of offices [and] the determination of their functions and jurisdiction" to Congress—not to the President or any officer working under him. *Myers v. United States*, 272 U.S. 52, 129 (1926). Executive agencies like FMCS "are creatures of statute," brought into existence by Congress and taken out of existence only by Congress, through bicameralism and presentment. *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). And if Congress cannot delegate less substantial grants of regulatory authority through "modest words," "vague terms," or "subtle devices," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022), then an agency surely lacks any constitutional or statutory authority to cease its statutorily mandated functions, or hollow out its workforce so dramatically that it lacks the capacity to execute them, without any direction from Congress at all.

17.      Defendants' *ultra vires* destruction of FMCS violates the separation of powers, and is contrary to law, in excess of statutory authority, contrary to constitutional power, and arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"). Defendants' actions also have unlawfully withheld required agency action, in further violation of the APA.

18. Plaintiffs are labor unions across the country that regularly engage the services of FMCS mediators to assist in resolving labor disputes with employers. Some of them were scheduled for negotiation sessions with an FMCS mediator on March 26, 2025, or the following days, but the mediator was forced to abruptly leave or cancel the negotiations because they had been placed on administrative leave. With only five or six mediators remaining at FMCS, Plaintiffs cannot expect to secure the services of an FMCS mediator any time in the foreseeable future. Without the services of FMCS, Plaintiffs are left in the lurch, often working under expired contracts or no contracts, and strikes or lockouts are much more likely.

19. Some FMCS mediators have returned to work pursuant to a court order granting a preliminary injunction in *Rhode Island v. Trump* (D.R.I. Case No. 25-cv-00128-JJM-AEM). It is currently unclear whether and to what extent mediation services are being resumed, and in any event, the government is challenging the court's order in the *Rhode Island* litigation.

20. Defendants' dismantling of FMCS has already harmed Plaintiffs, and if allowed to stand, would irrevocably harm them and their members across the United States.

## JURISDICTION AND VENUE

21. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201(a).

22. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff UFT is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur in the Southern District of New York.

## PARTIES

23. Plaintiff American Federation of Teachers, AFL-CIO ("AFT") represents 1.8 million members in more than 3,000 local affiliates. AFT members work as pre-K through 12th

grade teachers; paraprofessionals and other school personnel; higher education faculty and

professional staff; federal, state and local government employees; early childhood educators; and

nurses and other healthcare professionals. AFT is headquartered in Washington, D.C.

24.    Plaintiff United Federation of Teachers ("UFT") is an affiliate of AFT and

represents nearly 200,000 members in New York City. UFT members work as teachers,

classroom paraprofessionals, school secretaries, school counselors, occupational and physical

therapists, family childcare providers, nurses, and other employees in public schools, private

educational institutions, charter schools, and cultural and creative institutions in New York City.

UFT is headquartered in New York, NY.

25.    Plaintiff Service Employees International Union, AFL-CIO ("SEIU") is a labor

organization of approximately two million working people united by the belief in the dignity and

worth of workers and the services they provide. SEIU's members work in healthcare, the public

sector, and property services. SEIU has over 150 affiliates across the United States, Canada, and

Puerto Rico, and is headquartered at 1800 Massachusetts Ave., N.W., Washington, D.C. 20036.

SEIU members include physicians, technicians, long-term care workers, janitors, security

officers, airport workers, librarians, childcare workers, educators, fast food workers, employees

who work for city, county, and federal governments, and many more. As the largest healthcare

union in North America, SEIU relies on FMCS's statutorily required services for healthcare

institutions; however, SEIU and its affiliates across the country likewise rely on FMCS for

mediation, card check services, and other services.

26.    Plaintiff SEIU Healthcare Minnesota & Iowa is an affiliate of SEIU and

represents 60,000 healthcare workers in hospitals, clinics, nursing homes, and home care in

Minnesota, Iowa, Wisconsin, North Dakota, South Dakota, and Nebraska. SEIU Healthcare Minnesota & Iowa is headquartered in St. Paul, MN.

27.    Plaintiff SEIU Committee of Interns and Residents ("CIR") is an affiliate of SEIU and represents over 37,000 interns, residents, and fellows in hospitals throughout the United States including California, Delaware, Florida, Idaho, Illinois, Massachusetts, New Jersey, New Mexico, New York, Pennsylvania, Rhode Island, Vermont, Washington, and Washington, D.C. SEIU CIR is headquartered in Long Island City, NY.

28.    Plaintiff United Food and Commercial Workers, AFL-CIO ("UFCW") represents 1.2 million workers in 1,000 local unions. UFCW members work in grocery and retail stores, pharmacies, health care and manufacturing facilities, and food processing and meat packing industries, among other areas.

29.    Plaintiff UFCW Local 135 is an affiliate of UFCW and represents 13,000 workers in San Diego and Imperial Counties in California. UFCW Local 135 members are grocery workers, packing and processing workers, retail workers, and health care workers. UFCW Local 135 is headquartered in San Diego, CA.

30.    Plaintiff UFCW Local 2013 is an affiliate of UFCW. Local 2013 represents over 14,000 members working in food manufacturing, warehousing, and healthcare in metropolitan New York City. Local 2013 is headquartered in Brooklyn, NY.

31.    Plaintiff International Association of Machinists and Aerospace Workers, AFL-CIO ("IAM") represents 600,000 workers in nearly 1,000 local unions. IAM members work in the aerospace, transportation, Federal Government, automotive, defense, woodworking, and several other industries. IAM is headquartered in Upper Marlboro, MD.

32.    IAM District 160 is an affiliate of IAM and represents 4,300 active and retired members across numerous industries in Washington, Alaska, Nevada, and Idaho. IAM District 160 is headquartered in Seattle, WA.

33.    Plaintiff American Federation of State, County & Municipal Employees, AFL-CIO ("AFSCME") represents 1.4 million members in approximately 3,400 local unions, 58 councils and other affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME represents both public and private sector employees, including nurses, corrections officers, sanitation workers, and childcare providers. AFSCME is headquartered in Washington, D.C.

34.    Plaintiff AFSCME Council 31 is an affiliate of AFSCME. Council 31 represents more than 90,000 active and retired workers in the state of Illinois, including in health care industries. Council 31 is headquartered in Chicago, Illinois.

35.    Plaintiff United Nurses Associations of California/Union of Health Care Professionals ("UNAC/UHCP") is an affiliate of AFSCME and represents more than 40,000 registered nurses and other healthcare professionals in California and Hawaii. UNAC/UHCP is headquartered in San Dimas, CA.

36.    Plaintiff National Education Association ("NEA") is the nation's largest labor union, representing three million members in affiliates in every state and more than 14,000 communities across the Nation. NEA members work at every level of education, from preschool to university graduate programs, serving over 50 million students. NEA is headquartered in Washington, D.C.

37.    Plaintiff Ohio Education Association ("OEA") is an affiliate of NEA and represents approximately 115,000 public-sector teachers, education support professionals,

faculty, and other education employees across the state through 748 local affiliates. OEA is headquartered in Columbus, Ohio.

38.    Plaintiff American Federation of Government Employees, AFL-CIO ("AFGE") represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States. AFGE is headquartered in Washington, D.C.

39.    Plaintiff American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") is an unincorporated labor federation composed of 63 national and international labor organizations representing 15 million working people throughout the nation and the economy. AFL-CIO affiliated unions and their local unions rely on FMCS to perform each of the agency's statutorily mandated functions; for instance, these affiliated unions and their locals regularly engage FMCS to mediate collective-bargaining negotiation sessions and high-impact grievance settlement discussions, to provide arbitration panels and appoint arbitrators, to accept and properly docket the submitted F-7 forms that provide notice of an expiring collective bargaining agreement, and to mediate negotiation impasses in the federal sector. The AFL-CIO is headquartered in Washington, D.C.

40.    Defendant Gregory Goldstein is the Acting Director of FMCS, and is sued in his official capacity.

41.    Defendant Federal Mediation and Conciliation Service is an independent agency headquartered in Washington, D.C. It is an agency for purposes of the APA.

42.    Defendant the United States of America is sued in its governmental capacity as a proper party defendant for actions seeking relief under the APA. 5 U.S.C. § 702.

43.    Defendant United States Office of Management and Budget is an office in the Executive Office of the President. It is an agency for purposes of the APA.

44.    Defendant Russell T. Vought is the Director of the Office of Management and Budget. He is sued in his official capacity.

## LEGAL BACKGROUND

***Congress created FMCS and charged it with fulfilling numerous statutory mandates and responsibilities.***

45.    Through the Labor-Management Relations Act of 1947, known as Taft-Hartley, Congress created FMCS as an independent agency. *See* Labor-Management Relations Act, 1947, Pub. L. No. 80-101, § 202; 29 U.S.C. § 172(a).

46.    Congress created FMCS pursuant to three federally declared policies:

a.    That "sound and stable industrial peace and the advancement of the general welfare, health, and safety of the Nation and of the best interests of employers and employees can most satisfactorily be secured by the settlement of issues between employers and employees through the processes of conference and collective bargaining between employers and the representatives of their employees," 29 U.S.C. § 171(a);

b.    That "the settlement of issues between employers and employees through collective bargaining may be advanced by making available full and adequate governmental facilities for conciliation, mediation, and voluntary arbitration," *id.* § 171(b);

c.    And that "certain controversies which arise between parties to collective-bargaining agreements may be avoided or minimized by making available full and adequate governmental facilities for furnishing assistance to employers and the representatives of their employees," *id.* § 171(c).

47.    To lead FMCS, Congress created the position of a Director, appointed by the President with the advice and consent of the Senate. *Id.* § 172(a).

48.    Congress has vested the Director with the authority to "appoint such conciliators and mediators as may be necessary to carry out the functions of the Service," and "to appoint such clerical and other personnel as may be necessary for the execution of the functions of the Service." *Id.* § 172(b).

49.    For over 75 years, Congress has repeatedly charged FMCS with carrying out several mandatory functions, including (i) mediating labor disputes that may cause a substantial interruption to commerce, (ii) mediating all labor disputes in the health-care sector, (iii) establishing and maintaining joint labor-management committees, (iv) providing services to resolve negotiation impasses in the federal sector, (v) providing services to resolve certain labor disputes in the U.S. Postal Service, and (vi) maintaining a Roster of Arbitrators for adjudicating contract-based disputes all over the country.

### *Mediating Collective Bargaining Disputes, with a Mandatory Focus on the Healthcare Industry*

50.    Principally, in Title II of the Labor-Management Relations Act of 1947 (Pub. L. No. 80-101, as amended, 29 U.S.C. § 158(d), 173, *et seq.*), Congress mandated that "[i]t shall be the duty of the [FMCS], in order to prevent or minimize interruptions of the free flow of commerce growing out of labor disputes, to assist parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." 29 U.S.C. § 173(a).

51.    Likewise, the Health Care Amendments of 1974 (Pub. L. 93-360, 29 U.S.C. §§ 158(d)(A), (B)), and (C), which amended the National Labor Relations Act, included special provisions that require FMCS to intervene to prevent or minimize work stoppages in the health care industry.

52.     Specifically, under both laws, any party who seeks to "terminate or modify" an existing collective bargaining agreement ("CBA") must provide notice, known as an F-7 Notice, to FMCS 30 days before—or, in the case of parties in the healthcare sector, 60 days before—terminating or modifying the contract, so that FMCS may provide its services. *See* 29 U.S.C. §§ 158(d)(3), (d)(4)(A); 29 C.F.R. § 1402.1.

53.     On average, FMCS receives 15,000–16,000 F-7 notices each year.

54.     FMCS regulations require it to review each individual F-7 notice "to determine if [FMCS] should proffer its services under its policies. If sufficient data on which to base a determination is not at hand, [FMCS] will inquire into the circumstances surrounding the case." 29 C.F.R. § 1403.3.

55.     When FMCS determines "in its judgment" that a labor "dispute threatens to cause a substantial interruption of commerce," it may provide its services to mediate the dispute, 29 U.S.C. § 173(a)–(b); 29 C.F.R. § 1403.2(c), and it "will assign one or more mediators to each labor-management dispute in which it has been determined that its services should [be] proffered." 29 C.F.R. § 1403.4.

56.     Neither the statute nor FMCS regulations define what constitutes "a substantial interruption of commerce," leaving it to the Agency's judgment to determine when to proffer its services for labor disputes outside the healthcare industry.

57.     For the healthcare industry, however, Congress has mandated that FMCS provide its services upon receipt of an F-7 notice. "Whenever the collective bargaining involves employees of a health care institution," and "notice [of a labor dispute] is given to [FMCS] . . . the Service shall promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement." 29 U.S.C. § 158(d)(C). Parties in the healthcare

sector "shall participate fully and promptly" with FMCS efforts to mediate a dispute. *Id.* Moreover, "a labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention" so that FMCS may become involved. 29 U.S.C. § 158(g).

### *Establishing and Assisting Joint Labor-Management Relations Committees*

58.     In the Labor Management Cooperation Act of 1978 (Pub. L. No. 95-524, 29 U.S.C. § 175a), Congress "directed [FMCS] to provide assistance" to employers and labor organizations in establishing and operating "plant, area and industrywide labor management committees." 29 U.S.C. § 175a(a)(1).

59.     Congress has mandated that FMCS assist with establishing and operating these labor management committees for "the purpose of improving labor management relationships, job security, organizational effectiveness, enhancing economic development or involving workers in decisions affecting their jobs including improving communication with respect to subjects of mutual interest and concern." *Id.*

60.     Congress has also specifically required that FMCS "shall carry out the provisions of this section" related to joint labor management committees "through an office established for that purpose." 29 U.S.C. § 175a(c).

### *Mediating Negotiation Impasses in the Federal Sector*

61.     The Civil Service Reform Act of 1978 (Pub. L. No. 95-454, 5 U.S.C. § 7119(a)) establishes a process for federal agencies and exclusive collective bargaining representatives to resolve labor disputes and impasses in negotiations, which ultimately concludes with the assistance of the Federal Service Impasses Panel ("FSIP"). 5 U.S.C. § 7119(a)–(b).

62.     Before parties in the federal sector may seek the assistance of FSIP, however, they must first seek the assistance of a mediator. While parties may seek private mediation assistance, Congress has directed that FMCS "shall provide services and assistance to agencies and exclusive representatives in the resolution of negotiation impasses." *Id.* § 7119(a).

63.     Unlike the services of a private mediator, the services of FMCS come at no fee or only a nominal fee to the federal agencies and labor organizations that request their assistance.

64.     When parties in the federal sector seek the assistance of FMCS, they may not ultimately proceed to FSIP unless the mediation process has been exhausted. FMCS "shall not refer a case to FSIP until the mediation process has been exhausted and the parties are at a negotiation impasse." 29 C.F.R. § 1425.5. And when considering whether to assert jurisdiction over a negotiation dispute, FSIP investigates, among other things, whether mediation has taken place. 5 C.F.R. § 2471.6.

65.     FMCS provides the most experienced and cost-effective option for agencies and federal sector labor organizations to satisfy a required step in the resolution of negotiation impasses in the federal sector.

### *Mediating Disputes in the United States Postal Service*

66.     For labor disputes in the U.S. Postal Service, Congress has mandated a special role for FMCS.

67.     The Postal Accountability and Enhancement Act of 2006 (Pub. L. 109-435, as amended, 39 U.S.C. § 1207), "requires FMCS to provide mediation services and assist in

establishing arbitration boards in collective bargaining disputes between the Postal Service and the exclusive representatives of its employees."[4]

68.     Specifically, Congress has required that parties to collective bargaining agreements in the U.S. Postal Service must provide notice to FMCS of the existence of a dispute within 45 days of providing notice to terminate or modify the agreement. 39 U.S.C. § 1207(a). If the parties fail to reach agreement by the CBA's expiration date, Congress has mandated that FMCS "shall within 10 days appoint a mediator of nationwide reputation and professional stature, and who is also a member of the National Academy of Arbitrators." *Id.* § 1207(b). By law, the parties are required to cooperate with the FMCS-appointed mediator. *Id.*

69.     If the parties are unable to reach an agreement within 60 days after the expiration of the CBA, they must select an arbitration board of three members according to statute. *Id.* § 1207(c)(1). If the parties cannot agree on the selection of the arbitration board, "the selection shall be made from a list of names provided by the Director [of FMCS]," consisting of arbitrators "of nationwide reputation and professional nature, who are also members of the National Academy of Arbitrators, and whom the Director has determined are available and willing to serve." *Id.*

70.     In disputes involving postal supervisors represented by a "supervisors' organization," Congress has mandated that FMCS play a role in disputes concerning "changes in pay policies and schedules and fringe benefit programs." 39 U.S.C. § 1004(e)(1).

71.     The Act to Establish Dispute Resolution Procedures to Settle Disputes Between Supervisors and the United States Postal Service, 1980 (Pub. L. No. 96-326, as amended, 39

---

[4] FMCS, *Congressional Budget Submission 2025*, at 17 (Submitted to Congress, March 2024), available at https://www.fmcs.gov/wp-content/uploads/2024/03/2025-Congressional-Budget.pdf (hereinafter "*Budget Submission*").

U.S.C. § 1004), "directs FMCS, upon the request of either the Postal Service or an organization representing its supervisors, to convene fact finding panels to recommend supervisory pay and fringe benefit policies and to create panels to review the effectiveness of these procedures and other employment policies."[5]

72.     Specifically, upon request, FMCS must convene a factfinding panel of "experts in supervisory and managerial pay policies" to make a recommendation. 39 U.S.C. § 1004(f)(2). If the parties cannot agree on the composition of the panel based on names provided by FMCS, then FMCS "shall make the designation" of the individuals to serve on the panel. *Id.*

### *Maintaining the Roster of Arbitrators*

73.     Congress has also charged FMCS with "maintaining rosters of neutrals and arbitrators, and [adopting] such procedures and rules as are necessary to carry out" that responsibility. 29 U.S.C. § 173(f).

74.     Pursuant to that charge, FMCS maintains a Roster of Arbitrators from which parties to collective bargaining agreements may select an arbitrator to adjudicate contract-based disputes. 29 C.F.R. § 1404.1.

75.     The FMCS Office of Arbitration Services "maintains a roster of about 1,000 independent non-federal arbitrators who are qualified to hear and decide disputes over the interpretation or application of collective bargaining agreements. Upon request from the parties and the payment of a nominal fee, FMCS provides a list of qualified names from which the parties may choose an arbitrator to hear their case and render a decision."[6]

76.     FMCS regulations enumerate a number of criteria for the arbitrators it selects to serve on the roster. *See generally* 29 C.F.R. § 1404.5. The FMCS Office of Arbitration Services

---

[5] *Budget Submission*, *supra* note 4, at 17.
[6] *Budget Submission*, *supra* note 4, at 9.

contains an Arbitrator Review Board appointed by the Director composed "entirely of full-time officers or employees of the Federal Government." *Id.* § 1404.3(c). The FMCS Office of Arbitration Services and Arbitrator Review Board determine the qualifications for arbitrators included on the roster, consider applications for inclusion, and monitor continuing eligibility, subject to the Director's ultimate discretion. The Arbitrator Review Board also considers complaints about arbitrators on the roster and may ultimately recommend that the Director remove an arbitrator from the roster. *See generally id.* §§ 1404.3–1404.5.

77. Currently, there are hundreds of CBAs between unions and federal agencies, including many agreements to which the plaintiff unions or their affiliates are parties, that require the parties to obtain an arbitrator for grievances and contract-based disputes from the FMCS roster. There are thousands of private-sector CBAs that also so require.

78. The federal government itself agreed to those federal-sector contracts requiring the selection of an arbitrator from the FMCS roster.

79. In fiscal year 2024, FMCS supplied approximately 10,000 arbitrator panels and appointed over 4,000 arbitrators to hear cases.

### *Congressional Appropriations to FMCS to Fulfill Its Statutory Mandates*

80. To fulfill these statutory responsibilities, Congress has appropriated, through a series of continuing resolutions for fiscal year 2025, $53,705,000 for FMCS. *See* Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, div. A, § 101(8), 138 Stat. 1524, 1524–25 (2024) ("First Continuing Resolution") (appropriating funds as provided in certain FY2024 appropriations laws and making them available through December 20, 2024); American Relief Act, 2025, Pub. L. No. 118-158, div. A, § 101(1), 138 Stat. 1722, 1722–23 (2024) ("Second Continuing Resolution") (extending funding through March 14, 2025); Full-Year

Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101(a)(8), 139 Stat. 9, 10–11 (2025) ("Third Continuing Resolution") (extending funding through September 30, 2025).

81.    Most relevant here, effective March 15, 2025, Congress appropriated amounts at the levels specified in, and "under the authority and conditions provided in appropriations Acts for fiscal year 2024," specifically, the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2024 (division D of Public Law 118–47) ("2024 Appropriations Act"). Third Continuing Resolution, div. A, § 1101(a)(8), 139 Stat. 9, 10–11.

82.    The 2024 Appropriations Act specifically appropriated $53,705,000 "[f]or expenses necessary for the Federal Mediation and Conciliation Service ("Service") to carry out the functions vested in it by the Labor-Management Relations Act, 1947 . . . ; for expenses necessary for the Labor-Management Cooperation Act of 1978; and for expenses necessary for the Service to carry out the functions vested in it by the Civil Service Reform Act." Pub. L. No. 118-47, 138 Stat. 460, 697 (2024).

83.    That appropriated amount is the exact dollar figure that FMCS requested in its Congressional Budget Request for 2025—a 50-page document, in which FMCS outlined all of its statutorily required responsibilities, authorized services, and historical workload outputs and estimates for the future.[7]

84.    "Given the anticipated size and number of collective bargaining agreements expiring in 2025, the need to update its technical capacity to meet the anticipated demand for FMCS services, and the ongoing need for labor and management to work collaboratively to

---

[7] *See generally Budget Submission*, *supra* note 4.

achieve competitiveness, economic development, and job security," FMCS requested that Congress continue to fund FMCS at existing levels.[8]

85.     Congress granted that request without modification. Through its continuing appropriations, Congress has manifested a clear intent that FMCS continue to provide its statutorily required functions and services at the same levels as provided in 2024.

## FACTUAL ALLEGATIONS

### *FMCS Services Have Successfully Mediated Substantial Labor Disputes Returning $500 Million in Savings to the American Economy*

86.     With a small budget comprising only 0.0014% of the federal budget, FMCS has executed its statutory mandates as Congress directed with remarkable success.

87.     In fiscal year 2024, FMCS employed approximately 143 full-time mediators. These mediators are highly skilled in assisting employers and unions to reach agreement in collective bargaining and in disputes related to collective bargaining.

88.     In fiscal year 2024, FMCS "conducted over 5,400 mediated negotiations, over 1,500 workplace relationship services, and provided over 10,000 arbitration panels."[9]

89.     In fiscal year 2023, FMCS conducted over 4,800 mediated negotiations, over 1,500 workplace relationship services, and provided over 9,700 arbitration panels.[10]

90.     By its own conservative estimates, FMCS's efforts year after year have saved the American economy "over $500 million annually."[11]

91.     To name just a few examples, in 2024:

---

[8] *Id.* at 13.
[9] *A Strategic Investment*, *supra* note 1.
[10] FMCS, *Fast Facts About the Agency* (Jan. 2024), https://www.fmcs.gov/wp-content/uploads/2024/02/FMCS-Fast-Facts-FY23-update-Jan-2024.pdf.
[11] *A Strategic Investment*, *supra* note 1.

a.      FMCS helped avert a strike by 8,000 utility workers from the Utility Workers Union of America against Consolidated Edison Corporation ("ConEd") in New York City that would have occurred during a heat wave in the summer of 2024. An FMCS mediator conducted four mediation sessions in one week that led the parties to reach a tentative agreement the morning after their contract's midnight expiration. FMCS's efforts ultimately benefited the 3.6 million New York residents that ConEd serves throughout New York City boroughs and Westchester County.[12]

b.      FMCS facilitated an agreement between St. Christopher's Hospital for Children and a 500-member bargaining unit represented by the Pennsylvania Association of Staff Nurses and Allied Professionals. Negotiations between the parties had stalled in February 2024 before an FMCS mediator came to the table. Three months and three mediated sessions later, the parties reached an agreement in May 2024, averting a planned strike by the union.[13]

c.      FMCS assisted Chicago Public Schools and SEIU Local 73 in reaching a new collective bargaining agreement for 11,000 school support workers serving 323,000 students across 635 schools in every part of Chicago. Negotiations between the parties had stalled over the course of approximately eight months before an FMCS mediator joined the table in February 2024. After 12 mediated bargaining sessions, the parties

---

[12] FMCS, *FMCS Mediates Critical New York Utility Workers' Contract Negotiations To Prevent Heat Wave Strike* (August 2024), https://www.fmcs.gov/wp-content/uploads/2024/11/2024-08-FMCS-Mediates-Critical-NY-Utility-Workers-Contract-Negotiations-to-Prevent-Heat-Wave-Strike.pdf.
[13] FMCS, *Federal Mediator Assists St. Christopher's Hospital and Union In Reaching Agreement to Avert Strike* (July 2024), https://www.fmcs.gov/wp-content/uploads/2024/11/2024-07-Federal-Mediator-Assists-St-Christophers-Hospital-and-Union-in-Reaching-Agreement-to-Avert-Strike.pdf.

achieved a tentative agreement two months later, in April 2024, averting a pending strike vote.[14]

92.    To name a few more examples from 2023:

a.    FMCS played a pivotal role in resolving a lengthy labor dispute between CenterPoint Energy and 1,500 workers represented by the International Brotherhood of Electrical Workers ("IBEW"). After a failed ratification vote and more than five months of stalled bargaining, FMCS mediators joined the table and, after six mediation sessions, helped the parties reach an agreement less than three weeks after the vote, benefiting 2.4 million electricity customers in the greater Houston, Texas metroplex.[15]

b.    FMCS assisted the New York State Nurses Association and multiple health care facilities in New York settle a three-day strike by 7,000 nurses—one of the largest private-sector nurses strikes in the United States. Three FMCS mediators conducted continuous mediation sessions in multiple locations across New York City to end the strike and reach an agreement, ultimately benefiting 10 million residents across New York City and Westchester County by ensuring consistently available health care in area hospitals.[16]

c.    FMCS played an instrumental role in mediating contentious and difficult bargaining between AFSCME Local 1674 and the Howard Center in Vermont, where workers provide mental health and developmental disability services. The possibility of a

---

[14] FMCS, *Federal Mediation Helps Chicago Public Schools and Support Staff Avert Strike With New Contract Agreement* (June 2024), https://www.fmcs.gov/wp-content/uploads/2024/11/2024-06-Federal-Mediation-Helps-Chicago-Public-Schools-and-Support-Staff-Avert-Strike-With-New-Contract-Agreement.pdf.

[15] FMCS, *FMCS Mediators Successfully Facilitate Agreement Averting Strike For Centerpoint Energy and IBEW* (Nov. 2023), https://www.fmcs.gov/wp-content/uploads/2024/11/2023-11-FMCS-Mediators-Successfully-Facilitate-Agreement-Averting-Strike-for-CenterPoint-Energy-and-IBEW.pdf.

[16] FMCS, *NYC Nurses' Strike Ends After Successful Federal Mediation* (Feb. 2023), https://www.fmcs.gov/wp-content/uploads/2024/11/2023-02-NYC-Nurses-Strike-Ends-After-Successful-Federal-Mediation.pdf.

strike or lockout was high, but when the parties agreed to bring in FMCS, the mediator

was able to broker a final agreement, avoiding a costly work stoppage that would have

detrimentally affected the provision of vital health services.

93.    The valuable services that FMCS provides are not limited to labor disputes. In

November 2022, FMCS helped facilitate the Gulf Coast Rail Agreement between Amtrak, CSX

Transportation, Norfolk Southern Railway, and the Port of Mobile to reopen rail services

between New Orleans, Louisiana and Mobile, Alabama, which were disrupted by Hurricane

Katrina in 2005. FMCS mediators facilitated agreement between the parties after six years of

challenging negotiations, including 46 mediated sessions for a total of 150 hours, restoring

services to the more than 2.3 million residents in the Gulf Coast cities between New Orleans and

Mobile, as well as the 20+ million who visit the region each year.[17]

### President Trump's Executive Order Dismantling FMCS

94.    President Trump signed an Executive Order on March 14, 2025, entitled

"Continuing the Reduction of the Federal Bureaucracy." Exec. Order No. 14238 (Mar. 14, 2025).

95.    The Order directed that "the non-statutory components and functions [of FMCS

and other independent agencies] . . . shall be eliminated to the maximum extent consistent with

applicable law," and that "such entities shall reduce the performance of their statutory functions

and associated personnel to the minimum presence and function required by law." *Id.* § 2(a)(i).

96.    The Order further directed the Director of the Office of Management and Budget

("OMB") to "reject funding requests for [FMCS] to the extent they are inconsistent with this

order." *Id.* § 2(c).

---

[17] FMCS, *FMCS Mediates Beneficial Gulf Coast Rail Agreement* (Dec. 2022), https://www.fmcs.gov/wp-content/uploads/2024/11/2022-12-FMCS-Mediates-Beneficial-Gulf-Coast-Rail-Agreement.pdf.

97.    The Executive Order provided no reason whatsoever for FMCS to eliminate its non-statutory components and functions, or to reduce performance of its statutory functions and associated personnel to the minimum presence and function required by law.

98.    The Executive Order provided no facts or changed circumstances motivating any purported need to eliminate services and personnel at FMCS.

99.    The Executive Order required FMCS to submit a report to the Director of OMB within seven days, "explaining which components or functions [of the agency] are statutorily required and to what extent." *Id.* § 2(b).

100.    In direct response to the Executive Order, FMCS officials developed a plan to "ensure a coordinated approach to efficiency, optimization, and mission focus across the federal government."[18]

101.    FMCS already had submitted a plan to OMB and the U.S. Office of Personnel Management (OPM) on March 14, 2025 pursuant to a previous Executive Order and guidance from OPM,[19] but submitted a revised plan on March 21, 2025, according to the deadline imposed by the Executive Order.

102.    FMCS developed a plan to comply with the Executive Order based on the historical work of its approximately 143 mediators to fulfill its statutorily required responsibilities. To ensure that FMCS could continue to carry out its statutory mandates and

---

[18] Press Release, *FMCS Statement on the Executive Order "Continuing the Reduction of The Federal Bureaucracy"* (Mar. 19, 2025), https://www.prnewswire.com/news-releases/fmcs-statement-on-the-executive-order-continuing-the-reduction-of-the-federal-bureaucracy-302406098.html.
[19] Exec. Order No. 14210, *"Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative"* (February 11, 2025); Memorandum from U.S. Office of Management and Budget, U.S. Office of Personnel Management, *"Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative"* (Feb. 26, 2025), https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf.

responsibilities, FMCS determined that it would need to retain the services of approximately 100 mediators (or 80 mediators if services were provided primarily via remote meetings).

103.    A few days after FMCS submitted its proposal for continuing to fulfill its statutory mandates, as required by the Executive Order, individuals affiliated with DOGE and OMB, acting as agents of the President, injected themselves into FMCS's plan.

104.    On information and belief, DOGE and OMB rejected FMCS's plan and, without due consideration of the facts relevant to FMCS's ability to fulfill its statutory duties, directed FMCS to eliminate 93% of its workforce.

105.    Rather than the 80 to 100 mediators that FMCS had determined, in its own judgment, were the minimum necessary to fulfill the statutory mandates described above, DOGE and OMB ordered that only five to six mediators would remain at FMCS.

106.    DOGE and OMB further directed cuts to essentially the entire FMCS staff with the exception of the Acting Director, four employees in the Office of General Counsel, and a skeleton staff for budget, procurement, security, mail, and reviewing F-7 notices and providing arbitration panels.

107.    DOGE and OMB also directed FMCS to close all nine of its District/Field offices across the United States.

108.    FMCS and Acting Director Gregory Goldstein have implemented the drastic cuts to FMCS's services and personnel as directed by the Executive Order, DOGE, and OMB.

109.    With the exception of the Acting Director, five to six mediators, and approximately eight other staff, FMCS placed all other meditators and staff on administrative leave beginning on March 26, 2025.

110.    Affected employees began receiving specific notices of a Reduction in Force (RIF) on March 31, 2025.

111.    Those RIF notices took effect as early as May 10, 2025, due to OPM granting a waiver of the ordinary 60-day notice period provided to employees who are selected for release through a RIF.

112.    The RIF notices, and OPM's waiver of the 60-day notice period, are premised upon the "significant curtailment of duties" that the President has ordered at FMCS. Specifically, and without any basis in statute or regulation, the RIF notices claim that "[t]he [Trump] administration's interpretation of substantial impact to interstate commerce under Taft Hartley is when the dispute involves a bargaining unit of 1000 employees or other metrics or instances as the administration may determine and communicate to FMCS."

113.    One of the mediators who remain at FMCS has confirmed further draconian limits on FMCS's services in an email to an affected union: "Under DOGE," the agency is allowed only to provide mediation services to (1) private sector collective bargaining units of 1,000 or more employees, and (2) health-care collective bargaining units of 250 or more employees— "[a]ll other cases will be closed."

114.    In creating FMCS, however, Congress determined that FMCS must provide its services, "whenever in *its* judgment such dispute threatens to cause a substantial interruption of commerce." 29 U.S.C. § 173(b) (emphasis added).

115.    Before DOGE and OMB's order to hollow out nearly the entire workforce at FMCS, the agency had "in its judgment" determined the minimum number of mediators and staff it needed to continue to provide its services to parties in labor disputes which "threaten[] to cause a substantial interruption of commerce." *Id.*

116.    FMCS did so based on an analysis of historical work outputs and anticipated projections of future need based on those metrics.

117.    DOGE and OMB totally disregarded FMCS's prior judgment, and instead— without any basis in law or fact—substituted their own judgment in determining how FMCS must fulfill its statutory responsibilities, and with how many mediators, in clear defiance of the congressional grant of such judgment and authority to FMCS itself.

118.    In addition, DOGE and OMB's arbitrary limits on the FMCS's ability to provide its services to parties in the healthcare sector violates the Congressional command that "[w]henever the collective bargaining involves employees of a health care institution," and "notice [of a labor dispute] is given to [FMCS] . . . the Service *shall* promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement." 29 U.S.C. § 158(d)(C).

119.    Following DOGE and OMB's order at the behest of the President, FMCS has dismantled itself.

120.    Even if FMCS had determined, in its own judgment, to reduce its services so dramatically because of a purported change in interpretation of its enabling statute, FMCS has not provided any reasoned analysis or explanation of its authority or reason for doing so.

121.    Nor has FMCS explained the determination that *only five to six* mediators are sufficient to fulfill FMCS's required statutory responsibilities, when it had previously determined that 80 to 100 were required.

122.    As a result of the President's Executive Order to dismantle FMCS, FMCS is unable to fulfill the responsibilities that Congress has required.

123. According to one employee, "Nearly all of the services [FMCS has] provided—mediation for collective bargaining, grievances, employment disputes, EEOC complaints, and trainings with both unions and management to promote labor peace—are no longer going to be provided."[20]

124. Currently, there is one employee at FMCS to review and investigate approximately 15,000 to 16,000 F-7 notices that FMCS receives each year concerning negotiations of expiring CBAs. FMCS must review every single F-7 notice to determine whether its services are statutorily required, as Congress has charged. That same employee must maintain an up-to-date roster of qualified arbitrators, and provide around 10,000 arbitration panels this year alone to parties who require or seek an arbitrator from the FMCS Roster. As a matter of common sense, it would be impossible for one full-time employee working 2,000 hours per year to competently perform all of those tasks. Indeed, on the FMCS website page where parties can request a custom arbitration panel, the agency has advised that responses to such requests will be delayed "due to current staff shortages."

125. Currently, there are only five to six FMCS mediators to provide the statutorily required services of mediating labor disputes across the country—3.4% of the mediator workforce that existed at FMCS just a few weeks before the cuts. Those same five to six mediators must *also* conduct required mediation of negotiation impasses in the federal sector, mediate disputes in the Postal Service, and establish and support labor-management committees.

126. To put that number in perspective, based on the agency's work in fiscal year 2024, five to six mediators are now responsible for conducting approximately 5,400 mediations

---

[20] Fed. News Network, *Federal labor mediation agency cuts staff down to 'skeleton crew'* (Mar. 26, 2025), https://federalnewsnetwork.com/workforce/2025/03/federal-labor-mediation-agency-cuts-staff-down-to-skeleton-crew/.

and more than 1,500 workplace relationship services across the country by themselves, in addition to their other statutorily mandated duties.[21]

127.    FMCS cannot possibly fulfill its statutory responsibilities related to mediation with a staff of five to six mediators. Indeed, even if there were any basis in law or fact for determining that only disputes of bargaining units of 1,000 employees or more have a substantial impact on commerce—which there is not—five to six FMCS mediators could not possibly fulfill all of FMCS's statutory duties for that limited number of disputes.

128.    The result of the President's Executive Order is that FMCS, and the valuable services it has provided to employers and labor organizations across the country for years, will all but cease to exist.

### Harms to Plaintiffs

129.    The Plaintiffs rely on FMCS mediators to assist in resolving labor disputes and thus avert disruptions to interstate commerce or health care services. Plaintiffs and their members will be harmed when there are insufficient mediators to assist in this dispute resolution.

130.    Plaintiff UFT regularly uses FMCS mediators to assist in negotiating CBAs for its private sector bargaining units. For instance, UFT represents teachers and staff at the Bronx Global Learning Institute for Girls, a private-sector employer, where UFT is currently in negotiations for a first contract. As the result of the settlement of a complaint brought against the employer alleging serious labor-law violations, the employer was required to pay for a private mediator to assist the parties in negotiations for the CBA and to engage in mediator-assisted negotiations at a minimum of once per week. The private mediator, however, did not help the parties make any progress over the course of a full year, and the parties were nowhere close to

---

[21] *A Strategic Investment*, *supra* note 1 (outlining 2024 figures).

agreement at the end of that year. Recognizing this, UFT and the employer agreed to work with an FMCS mediator. The parties saw immediate progress after they began working with the FMCS mediator.

131.   On March 26, 2025, however, the mediator told the parties that he could no longer assist them because he had been placed on administrative leave. The mediator's departure imperiled the substantial progress the parties had made. The parties did not believe they could reach an agreement without the FMCS mediator's assistance, and the risk of a strike or lockout goes up every day that UFT's members work without a contract.

132.   The parties therefore are paying out of pocket for the former FMCS mediator to continue assisting them, at a cost of more than $500 per hour. This is a significant cost for UFT, and UFT could not possibly afford to pay to replace all of the FMCS mediation services it relies on. In addition, UFT has not been able to pay for as many negotiation sessions as it would have used with a cost-free FMCS mediator, delaying progress.

133.   To take another recent example, UFT has recently been in negotiations for a CBA covering seventy-five employees at Merrick Academy, a charter school in New York City that is a private-sector employer. The no-strike and no-lockout clauses in the previous CBA have expired, so teachers and staff can strike, or the employer can lock them out, at any time. UFT and the employer initially made little progress in negotiations for a successor CBA, until the parties agreed to have an FMCS mediator assist. With the mediator's dedicated work to negotiate a CBA and avert a strike, the parties were close to reaching a final agreement after a bargaining session on March 18, 2025, and the parties had another session scheduled on March 27, 2025.

134.   The FMCS mediator, however, had to cancel the March 27, 2025 session because he was put on administrative leave. Without the mediator, the partes were unable to make further

progress, raising the risk of a strike or a lockout. The parties therefore are paying out of pocket for the former FMCS mediator to continue assisting them, at a cost of more than $500 per hour.

135.    Plaintiff SEIU CIR, which represents health care workers throughout the country, relies heavily on FMCS mediators. CIR has organized twelve new units of healthcare workers in the last four months, and now must negotiate first contracts with the employers. Getting to an agreement on first contracts is typically more difficult than negotiating successor agreements as the parties do not have the benefit of an existing agreement to use as a reference point when attempting to reach agreements on important terms and conditions of employment. CIR intended to rely on FMCS mediators in these difficult negotiations, as it historically has. Not having FMCS mediators will make it much harder to reach agreements.

136.    To take a specific example, CIR has been engaged in negotiations for a first contract for resident physicians at Mass General Brigham ("MGB") for nearly two years. An FMCS mediator assigned to the negotiations had been helping the parties resolve the disputes that had been impeding an agreement, but the FMCS mediator is no longer able to provide assistance. This made it much more difficult to reach a contract, to the detriment of more than 2,400 healthcare workers.

137.    Another SEIU local affiliate, Plaintiff SEIU Healthcare Minnesota & Iowa, is negotiating first contracts for five units, representing about 260 workers, including thirty registered nurses and licensed practical nurses at North Shore Estates long term care and rehabilitation facility, thirty registered nurses and licensed practical nurses at Duluth National Shore East, and fifteen physical, occupational, and speech therapists at Bayshore Nursing Facility. Healthcare Minnesota's units rely on the availability of FMCS's mediation services in

negotiating first contracts, as is standard practice. Without those services, approximately 260 workers are continuing to work without a contract.

138.    At the North Shore Estates, negotiations are contentious, and the workers have already undertaken a one-day unfair labor practice strike. Without assistance from FMCS, the workers continue to have no contract, and risk further labor disputes.

139.    Plaintiff IAM District 160 represents a unit of ninety-nine healthcare professionals at a standalone emergency room in Tacoma, Washington. The healthcare professionals include emergency room technicians, lab technicians, and patient-assessment testing technicians. Negotiations for a CBA have been contentious, and the employer seemed to be unwilling to continue without an FMCS mediator, but agreed to go forward with an FMCS mediator.

140.    On March 25, 2025, an IAM representative discussed meeting dates with the FMCS mediator. The next day, however, the mediator emailed to say that she had been placed on administrative leave and could no longer assist. The unavailability of an FMCS mediator has stopped all progress on a final agreement and increased the chances of a labor dispute that would disrupt area healthcare. Any strike at this location would have a serious impact on the local community, as the standalone emergency room serves a high volume of patients.

141.    In addition, IAM has hundreds of contracts that require the parties to use an FMCS mediator during the grievance and arbitration process. To take one example, IAM represents the employees of Delaware Resources Group at more than twenty locations. The CBAs cover F-35 pilot instructors, simulator technicians, F-16 pilot instructors, C-130 pilot instructors, software developers, mission support personnel, and KC-135 aircraft mechanics, among numerous other job classifications. Each of the CBAs has a grievance process spelled out,

whereby the parties can resolve disputes, and each CBA requires the use of an FMCS mediator before arbitration. No other mediator is permissible under the CBAs, and in the past, DRG has refused to advance a grievance to arbitration if the FMCS-specific mediation step is not completed. IAM thus will effectively lose the ability to enforce the CBAs without the availability of FMCS mediators.

142.    Plaintiff UFCW Local 135, along with other UFCW locals, represents grocery employees in California. CBAs covering approximately 65,000 of these workers expired on March 2, 2025. The no-strike and no-lockout provisions in those CBAs are no longer in effect, so union members could strike, or the employers could lock them out, at any time. Past negotiations between UFCW locals and the grocery employers have been very difficult, and since at least 2019, the parties have needed the services of an FMCS mediator to negotiate each of their successor CBAs.

143.    UFCW Local 135 and the other UFCW locals began meeting with the grocery employers in mid-February 2025, but progress was slow. Accordingly, in March 2025, the parties began working with an FMCS mediator, who helped the parties make valuable progress and worked tirelessly to avoid a strike.

144.    The parties had a bargaining session with the FMCS mediator scheduled for March 26, 2025, but because the FMCS mediator was placed on administrative leave and could not attend, the parties made very little progress at that session. The parties therefore decided to pay out of pocket for the former FMCS mediator to continue assisting them, at a significant cost of $1500 per day. A strike or a lockout would have significant impacts on the local economy, including impacts on union member grocery workers, suppliers, supply-chain employees, small businesses near grocery stores, and the grocery-buying public.

145.    As of March 26, 2025, UFCW Local 2013 was in negotiations with an employer, Quality King, where UFCW represents approximately 300 warehouse workers and truck drivers at a health and beauty products warehouse. As the Local 2013 negotiator was driving to a scheduled negotiating session with the FMCS mediator, the mediator texted to say he had to cancel, and he was terminated shortly thereafter. Although Local 2013 and the employer reached a contract, negotiations were significantly more difficult without an FMCS mediator. Without a mediator present, Local 2013 was unable to push as aggressively as planned, given that the employer had a greater ability to stall and delay, leading to a strike or lockout.

146.    UFCW Local 2013 is also negotiating a contract for a nursing home in the Bronx called Grand Manor. The previous contract expired on May 31, 2024, so a strike or lockout could occur at any time. The parties began negotiations in May 2024, but made little progress, and members became disgruntled. After members authorized a strike, the parties decided to work with an FMCS mediator to avert a strike. The mediator conducted multiple preparatory sessions, which were productive and encouraging to members. However, due to the RIFs, the mediator could not attend the joint session that had been scheduled with the parties and mediator on March 31, 2025. Although Local 2013 and Grand Manor still met, bargaining was not productive at all. After that, the parties scheduled one more bargaining date, which the employer canceled and never rescheduled. The parties have made no progress towards an agreement, members are very frustrated, and Local 2013 is preparing for a strike.

147.    UFCW Local 2013 represents approximately 1,300 members at 39 different adult homes and assisted living facilities in the New York City metropolitan areas. None of the 39 different bargaining units meets the 250-employee threshold that FMCS has imposed for healthcare units.

148.    Plaintiff AFSCME's affiliate, Council 31, has been in negotiations over a new contract for workers at the Thrive nursing home in Illinois for several months. The negotiations have been contentious, and the parties agreed to bring in an FMCS mediator to help avoid a potential strike. However, the assigned mediator can no longer provide services due to his sudden separation from active service brought on by the Executive Order, making a strike more likely. Council 31 is now actively preparing for a strike, including having strike pledges signed, advising workers on how to save money to prepare for a strike, and holding strike informational meetings.

149.    Plaintiff UNAC/UHCP is currently bargaining fifteen local collective bargaining agreements covering 32,000 workers with Kaiser Permanente. On May 5, 2025, UNAC/UHCP is scheduled to begin bargaining (with an alliance of health care unions) a national agreement with Kaiser Permanente covering 60,000 workers. For decades, mediators from FMCS have been an integral part of bargaining these complex local and national agreements. FMCS had planned to provide at least three mediators to be present throughout negotiations for the national Kaiser contract, and to provide mediators on an as-needed basis for local bargaining with Kaiser. Without those mediators, negotiations would be much more difficult, and the risk of a potentially devastating lockout or strike will increase. UNAC/UHCP therefore paid out of pocket for the terminated FMCS mediators to continue assisting them.

150.    In addition, many of Plaintiff AFSCME's affiliates routinely rely on FMCS services. To take just one example, AFSCME Council 31 and the state of Illinois routinely call on FMCS to mediate contract negotiations and avert labor disputes for 38,000 state workers whom AFSCME represents. The Illinois state labor relations statute requires FMCS involvement before a public-sector unit may strike. FMCS mediators have helped AFSCME and Illinois-

based employers reach agreement where they had previously been stalemated; for instance, an FMCS mediator helped the parties reach an agreement in 2021 after contentious negotiations at Eastern Illinois University. Council 31 and other AFSCME affiliates in Maryland and other states have avoided time- and resource-consuming litigation with the help of FMCS mediators.

151.    An affiliate of Plaintiff OEA began contract negotiations with the Granville Exempted Village School District and its 182-member wall-to-wall bargaining unit on March 26, 2025. The FMCS mediator assigned to assist with these negotiations was abruptly withdrawn mid-session, advising the parties that he would be unable to continue and that no other mediators would be available. The lack of an FMCS mediator and a structured negotiation process made it more difficult for the parties to reach agreement.

152.    The majority of OEA affiliate contracts require the use of FMCS mediators to resolve collective bargaining negotiations through mutually agreed dispute resolution procedures, while a smaller number of contracts also call for FMCS mediation in the grievance process. OEA affiliates generally cannot reopen these contracts to renegotiate such provisions without risking broader contractual instability.

153.    Moreover, OEA estimates that it would cost more than $100,000 annually to replace the services that FMCS mediators provide to affiliated local units. OEA-affiliated local units are already bearing the costs of paying for private mediators, and OEA is diverting institutional resources to determine how it can support collective bargaining without FMCS mediators.

154.    Plaintiff AFGE has hundreds of CBAs—agreed to by the federal government— that require the use of FMCS mediators or arbitrators, and AFGE's constitution requires the use of FMCS-appointed arbitrators in several circumstances. AFGE also regularly uses FMCS

mediators as a required step in advancing negotiation impasses to FSIP; those mediators are often successful at either avoiding the impasse or substantially narrowing the issues that FSIP must decide. With the unavailability of FMCS mediators, AFGE will have no practical ability to enforce its contracts with the federal government or advance its rights before the FSIP.

155.    All of these Plaintiffs and their members—and by extension the public—face immediate, substantial harm from the dismantling of FMCS and unavailability of FMCS mediators.

## CAUSES OF ACTION

### COUNT ONE
### Violations of the APA, 5 U.S.C. § 706(2)(A)–(C)

156.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

157.    Under the APA, a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A)–(C).

158.    Defendants Gregory Goldstein, FMCS, Russell Vought, OMB, and the United States are all proper defendants subject to APA review. *Id.* § 702.

159.    Defendants' dismantling of FMCS by hollowing out its workforce and adopting policies slashing FMCS's services, which followed from the President's March 14 Executive Order, constitutes a final agency action reviewable under 5 U.S.C. § 704.

160.    Defendants' actions are contrary to law and in excess of statutory authority. No Defendant possesses either the constitutional authority, as an agent of the President, or the statutory authority to dismantle FMCS; to direct its employees to cease work on statutorily

mandated programs and activities; or to withhold, terminate, or otherwise interfere with the disbursement of funds duly appropriated by Congress to FMCS for its programs and operations.

161.     Defendants' actions are also contrary to the United States Constitution because they violate fundamental separation of powers principles, as well as the Take Care Clause, the Appropriations Clause, and the Spending Clause. *See* U.S. Const. art. I, § 1; U.S. Const. art. I, § 7, cl. 2; U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. II, § 3.

    a.   The Constitution obligates the President—and by extension all subordinate executive officers—to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The Take Care Clause prohibits the President from directing federal officers to act in derogation of federal statute and prohibits federal officers from implementing such directives.

    b.   The March 14 Executive Order 14238 directing the head of FMCS to dismantle the agency by reducing the performance of its statutory functions and hollowing out its workforce, and Defendants' subsequent actions to do so, violate the Take Care Clause. The Order's further directive that Defendants OMB and Vought deny funding requests from FMCS that are inconsistent with the directives of that Order, also violates the Take Care Clause because it denies to FMCS funds that Congress has duly and consistently appropriated.

    c.   The Appropriations Clause of the Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Accordingly, the Clause "gives Congress control over the public fisc . . . ." *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 420 (2024).

d.  The Spending Clause of the Constitution provides: "Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1. The Spending Clause vests the power of the purse exclusively in Congress.

e.  The Executive Branch does not have constitutional authority to override or disregard Congress's appropriations. *In re Aiken Cnty.*, 725 F.3d 255, 260–61 (D.C. Cir. 2013).

f.  The March 14 Executive Order 14238 directing the head of FMCS to dismantle the agency by eliminating and drastically reducing the performance of its statutory functions, and Defendants' subsequent actions to do so—despite consistent appropriations by Congress at identical levels to fund the salaries and expenses of the number of mediators and other personnel that FMCS had previously determined were necessary to carry out the agency's statutory functions—infringe upon Congress's exclusive power over the federal purse.

g.  The March 14 Executive Order 14238 directing Defendants OMB and Vought to deny funding requests from FMCS that are inconsistent with the directives of that Order further infringes upon Congress's exclusive power over the federal purse.

h.  That exclusive power is conferred and protected in part by the Appropriations Clause and the Spending Clause, and the Executive Branch has no constitutional authority to countermand it.

162.  Defendants' dismantling of FMCS is arbitrary and capricious because Defendants have failed to provide any public explanation—let alone any reasoned explanation—for their

dismantling of FMCS; have failed to account for the reliance interests of employers and unions like Plaintiffs across the country who have relied on FMCS's services for decades to help resolve contentious labor disputes and who have enshrined that reliance in CBAs, including hundreds of CBAs to which the federal government agreed; have failed to consider the devastating consequences of reducing FMCS's functions and personnel so drastically as to render it unable to provide its services to employers and labor organizations representing workers across the country; have failed to provide a non-contrived reason for their dismantling of FMCS or reduction of staff below the previously determined necessary staff to fulfill the agency's statutory responsibilities; and have failed to provide any reasoned explanation for their novel and unsupported interpretation of "substantial interruption of commerce," 29 U.S.C. § 173(b), or for their selection of arbitrary thresholds for bargaining unit size as a pretextual basis for curtailing the statutory responsibilities of FMCS.

163.    An agency action is arbitrary or capricious where the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

164.    The Court should hold unlawful and set aside Defendants' actions in dismantling FMCS because those actions violate the APA.

**COUNT TWO**
**Violation of the APA, 5 U.S.C. § 706(1)**
**Unlawful Withholding of Agency Action**

165.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

166.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

167.    Defendant FMCS is an agency subject to the APA. *Id.* § 702.

168.    Defendants' dismantling of FMCS by hollowing out its workforce and adopting policies slashing FMCS's services, which followed from the President's March 14 Executive Order, constitutes a final agency action reviewable under 5 U.S.C. § 704.

169.    By dismantling FMCS and all but eliminating its required statutory activities, Defendants have unlawfully withheld agency action.

170.    The law requires that "[w]henever [FMCS] does proffer its services in any dispute, it shall be the duty of the Service promptly to put itself in communication with the parties and to use its best efforts, by mediation and conciliation, to bring them to agreement." 29 U.S.C. § 173(b); *accord* 29 C.F.R. § 1403.4 ("[FMCS] will assign one or more mediators to each labor-management dispute in which it has been determined that its services should [be] proffered.").

171.    As a result of Defendants' actions, multiple Plaintiffs immediately lost the services of the FMCS mediators who were proffering their services, in clear defiance of the statutory requirement that FMCS use its best efforts to bring parties to an agreement when it determines its services are necessary.

**COUNT THREE**
**Violation of the Separation of Powers**

172.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

173.    Plaintiffs have an inherent equitable right of action to enjoin and declare unlawful official action that violates the Constitution. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

174.    The March 14 Executive Order 14238 directing the head of FMCS to dismantle the agency by eliminating and drastically reducing the performance of its statutory functions, and Defendants' subsequent actions to do so—as well as the order to Defendants OMB and Vought

to deny requests for funds that Congress has duly appropriated—all exceed Executive Branch authority and impermissibly arrogate power that is reserved to Congress, in violation of the separation of powers. *See* U.S. Const. art. I, § 1; U.S. Const. art. I, § 7, cl. 2; U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. II, § 3.

## COUNT FOUR
### *Ultra Vires* Action

175.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

176.    Plaintiffs have an equitable right to enjoin as *ultra vires* Executive Branch practices that are beyond the authority of the Executive. *See Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022).

177.    No statute, constitutional provision, or other source of law authorizes Defendants to dismantle FMCS in violation of the Labor Management Relations Act. To the contrary, statutes such as the Health Care Amendments of 1974, the Labor Management Cooperation Act of 1978, and the Civil Service Reform Act of 1978, among others, create clear and mandatory statutory duties for FMCS to execute, and Congress has consistently appropriated funds to enable FMCS to fulfill those obligations.

178.    The March 14 Executive Order 14238 directing the head of FMCS to dismantle the agency by eliminating and drastically reducing the performance of its statutory functions, and Defendants' actions doing so, are in excess of their delegated powers, and *ultra vires*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.  Declare unlawful and set aside Executive Order 14238 entitled, "Continuing the
    Reduction of the Federal Bureaucracy" (March 14, 2025), as it applies to the
    FMCS;

B.  Issue a preliminary and permanent injunction barring Defendants from continuing
    their dismantling of FMCS and implementing Executive Order 14238 entitled,
    "Continuing the Reduction of the Federal Bureaucracy" (March 14, 2025), as it
    applies to FMCS, and requiring Defendants to take all necessary steps to return
    FMCS and its employees to their status prior to the March 14, 2025 Executive
    Order;

C.  Declare unlawful and set aside Defendants' actions to dismantle FMCS as
    unconstitutional; arbitrary, capricious, an abuse of discretion, or otherwise not in
    accordance with law under 5 U.S.C. § 706(2)(A); contrary to constitutional right,
    power, privilege, or immunity under 5 U.S.C. § 706(2)(B); in excess of statutory
    jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C.
    § 706(2)(C); and *ultra vires*;

D.  Compel FMCS to resume the mediation services that were being provided as of
    March 25, 2025 before they were unlawfully withheld, 5 U.S.C. § 706(1);

E.  Award Plaintiffs reasonable attorneys' fees and costs; and

F.  Grant such other relief as the Court deems necessary, just, and proper.

Date:   June 16, 2025                    */s/ Elisabeth Oppenheimer*
                                         Elisabeth Oppenheimer*
                                         Cole Hanzlicek*
                                         BREDHOFF & KAISER, P.L.L.C.
                                         805 Fifteenth St, N.W., Suite 1000
                                         Washington, D.C. 20005
                                         (202) 842-2600
                                         (202) 842-1888 (fax)
                                         eoppenheimer@bredhoff.com
                                         chanzlicek@bredhoff.com

                                         *Counsel for Plaintiffs*

                                         *Admitted *Pro Hac Vice*